THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ANTHONY LEE DIXON, Defendant-Appellant.

First District (1st Division)    No. 80-516

Opinion filed November 30, 1981.

Ralph Ruebner and Donald B. Mackay, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Adrienne Noble Nacev, and John Ashenden, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Defendant Anthony Lee Dixon was convicted in a bench trial of murder (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(1)) and burglary (Ill. Rev. Stat. 1977, ch. 38, par. 19—1(a)) and was sentenced to 40 years on the murder conviction and 7 years on the burglary conviction. Both sentences were to be served concurrently. On appeal, defendant argues that his confession and the physical evidence recovered must be suppressed as the fruit of a custodial interrogation which was not preceded by *Miranda* warnings. Defendant also argues that the classification of burglary as a forcible felony is arbitrary and unreasonable and, therefore, violative of his equal protection and due process rights.

We affirm.

The record of the hearing on defendant's motion to suppress reveals that on October 3, 1978, a 32-year-old black male was found strangled in his apartment. A subsequent investigation revealed that the deceased's apartment had been burglarized. Eugene Woods, a neighbor and long time friend of the deceased, had seen a 5'9", 135-140 pound black male who was about 22 years of age, wearing blue jeans and a two-tone blue denim hat, carrying furniture from the deceased's apartment to a taxi at about 4 p.m. on the day of the murder. According to Woods, this man frequented Bughouse Square, a park located at Dearborn and Delaware Streets in Chicago. On October 10, 1978, Woods contacted Chicago Police Officer Kaczka and his partner and informed them that the person whom he had observed on the day of the murder was in the park at Dearborn and Delaware. Kaczka and his partner met Woods at 901 North Clark Street shortly thereafter and Woods pointed out defendant, who was located a short distance away, as the man whom he had seen with the deceased's furniture. At this time defendant was talking with Officers Smith and McHugh. Kaczka went over to where the three stood and asked Smith if defendant was under arrest. When Smith replied that he was not under arrest, Kaczka informed Smith that defendant was a

suspect in a recent homicide and instructed him to transport defendant to Area 6 homicide headquarters.

Testimony concerning the events that transpired during the ride to the station and afterwards at the station was introduced at the hearings on defendant's motion to quash the arrest and suppress the physical evidence and to suppress defendant's confession. Officer Richard Smith testified for the State at the hearing on the motion to quash the arrest and suppress evidence. He testified that at 5 o'clock on October 10, 1978, he and his partner Officer McHugh were in Bughouse Square when they saw a black man approximately age 20-23, 5'7"-5'9", weighing 140 pounds, wearing blue jeans and a denim two-tone blue flop hat. He resembled a suspect wanted in a murder investigation of which Smith was aware. The suspect in the murder investigation was described as a 22-year-old black male, approximately 5'9", weighing 135 pounds, and wearing blue jeans and a multi-color blue flop cap who frequented the area near Bughouse Square. Smith testified that defendant matched both the physical and clothing description of the murder suspect. Moreover, when the officers approached defendant in their marked squad car he began walking away from them. At this time, the officers approached defendant and asked him for his name and address. Defendant gave his name and stated that he did not live in the area but lived on the south side. Smith then asked him why he was at Bughouse Square and defendant said that he had been at his girlfriend's house. A question regarding his girlfriend's address was objected to during the hearing on this motion and was again asked at trial. At that time, Smith responded that defendant gave his girlfriend's address as 1358 N. Sedgwick. At the time this conversation occurred, Officer Smith testified that defendant was not under arrest. This conversation took place prior to the appearance of Officers Kaczka and Flood at Bughouse Square.

Smith further testified that while he and his partner were talking with the defendant at Bughouse Square two undercover homicide investigators, Officers Kaczka and Flood, appeared and asked him whether they were arresting defendant. Smith replied in the negative and explained that they were conducting a field investigation. Kaczka and Flood then informed him that defendant matched the description of a homicide suspect and asked Smith and his partner to transport him to Area 6 Homicide headquarters. Smith patted down defendant and placed him in his squad car.

Officer Thomas Kaczka testified that he had been assigned to investigate an October 2, 1978, strangulation death. He had been informed by Woods, who knew the deceased, that a black male in his early 20's, 5'9", weighing 140 pounds and wearing a two-tone blue denim cap, had been seen carrying furniture to a waiting taxi on the day of the

murder. According to Woods, he knew the furniture was the deceased's because of his previous visits to his apartment. Woods also informed Kaczka that he had seen this same man on numerous occasions at Bughouse Square. Kaczka further testified that on October 10, 1978, he and his partner received a message indicating that Woods had seen the suspect at Bughouse Square. Woods' message indicated that he would meet Kaczka and Flood at 901 North Clark Street. After picking up Woods, Kaczka and Flood parked their unmarked car near the park and Woods remained in the car. Kaczka and Flood approached defendant, who was conversing with two uniformed police officers. Kaczka and Flood asked Smith and his partner, who were in uniform, whether defendant was under arrest. Smith answered in the negative. Kaczka spoke with these officers and explained that a witness had observed defendant carrying furniture from a homicide victim's apartment to a taxi. Smith explained that he and his partner also had been talking to defendant about a homicide investigation. Kaczka asked Smith to take defendant to Area 6 headquarters. Kaczka further testified that defendant was advised of his constitutional rights upon arriving at Area 6 headquarters.

Defendant then told both officers that he wanted to talk. A 20-minute discussion followed. Kaczka testified that after this conversation, the officer left to attempt to find a photograph of an individual mentioned by defendant. At 8 p.m. the officers returned and showed defendant photographs of accomplice James Anderson. Kaczka and Flood subsequently went to look for Anderson and, when they could not find him, proceeded to the apartment of defendant's girlfriend on Sedgwick in Chicago. Upon arriving at her residence and being told that defendant was her former boyfriend, Kaczka and Flood observed dining room furniture which resembled the deceased's furniture. The officers had a photograph which they had recovered from the deceased's apartment which showed his dining room furniture. The girlfriend informed the officers that the furniture had been given to her as a gift by defendant. The officers informed the girlfriend the furniture was stolen property and had been taken incident to a homicide. She acknowledged that the furniture had been taken from the deceased and told the officers she would cooperate. She then allowed the police to enter her apartment and subsequently showed the officers cash given to her by defendant on October 3, 1978. Kaczka and Flood returned to police headquarters at midnight and, after again advising defendant of his *Miranda* warnings, showed defendant the furniture recovered from his girlfriend's apartment. Defendant was again advised of his rights. Defendant understood these rights and told the officers he wanted to talk with them. A 20-minute conversation then took place. According to Kaczka, defendant was given food and a drink and

allowed washroom privileges. Defendant signed his written statement at 3:30 a.m.

Officer Flood corroborated Kaczka's testimony. He also explained that the crime lab transported the furniture found at Ms. Hale's to Area 6 headquarters. Flood also testified that he advised defendant of his *Miranda* rights prior to transporting defendant to Area 6 headquarters by the other officers.

Assistant State's Attorney Rebecca Davidson spoke to the defendant at 1 a.m. on October 11, 1978, concerning the deceased's murder. She informed him that she was investigating the murder and was an assistant State's Attorney, not defendant's lawyer. After she gave him his *Miranda* warnings, defendant told her he understood the warnings and wanted to talk about his version of the murder. This conversation lasted approximately 15 minutes. At approximately 3 a.m., a court reporter arrived and after receiving his *Miranda* warnings again, defendant gave a statement which he later read, edited and initialed. According to Davidson, defendant was never promised anything for his statement nor was he physically coerced.

Defendant testified that he had lived with his brother on the south side of Chicago for several weeks prior to his arrest. He stated that he had signed a consent form to search this south side residence. However, he later testified that he only told police where he had stayed the previous night, not where he had been living on the south side. He admitted making a statement to the police. He also admitted on cross-examination that his girlfriend was the only person living at the Sedgwick address during October 1978. He stated that he had lived at the Sedgwick address for four months and has paid approximately one-half of the rent in the apartment during this time. However, the apartment was his girlfriend's and the lease was in her name.

After hearing argument on the motion to quash the arrest and suppress the physical evidence received from his girlfriend's apartment, the court found that Officer Smith and his partner had reasonable grounds to stop defendant based on the fact that he matched the description of the murder suspect and denied the motions. The court also ruled that the arrest by Officers Kaczka and Flood was proper because of Woods' identification in light of defendant's physical description. The court also ruled that defendant had no reasonable expectation of privacy in his girlfriend's residence.

At the hearing on defendant's motion to suppress defendant's confession, the earlier testimony of Officer Smith, Assistant State's Attorney Davidson and defendant was admitted by stipulation. Officer Kaczka and Flood's testimony substantially duplicated their earlier testimony. After hearing this testimony the trial court denied the defendant's motion to

suppress the confession. The trial court found that the defendant was not coerced nor was he subjected to physical abuse or intimidation in giving the confession. Moreover, the court found that he had been fully advised of his rights. The court then ruled it was proper for Officer Smith to ask defendant his girlfriend's address prior to being taken to the police station because defendant stated he had been visting his girlfriend's house in the vicinity of Bughouse Square. The court rejected defendant's testimony that he had given the police the Sedgwick address while being transported to police headquarters. However, the trial court noted that even if defendant did give Officer Smith the address while enroute, this question would have been within the scope of a proper preliminary investigation.

During trial on the matter, defendant presented no evidence, although argument was heard by the court on defendant's motion for a directed verdict. The court found defendant guilty of murder and burglary and defendant was sentenced to concurrent terms of 40 years and 7 years on the murder and burglary findings, respectively. Defendant appeals.

Defendant argues that his confession and the evidence which was obtained from his girlfriend's apartment should be suppressed because they were obtained unlawfully through custodial interrogation which was not preceded by *Miranda* warnings. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) Defendant claims that, at the time that he furnished the police officers with the name and address of his girlfriend, he already had been taken into custody and that the officers did not advise defendant of his *Miranda* rights. He argues that the furniture of the deceased which was recovered from the apartment of defendant's girlfriend was discovered only after defendant provided the officers with her name and address during the unlawful custodial interrogation and that, therefore, the evidence should be suppressed. (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) Defendant further contends that his confession also is tainted because of the close causal connection between the statement obtained through unlawful custodial interrogation and his confession and the evidence recovered from his girlfriend's apartment. Although defendant's confession was preceded by *Miranda* warnings, he urges that this does not dissipate the taint which flows from the evidence discovered as a result of the unlawfully obtained statement. Additionally, defendant contends that the confession was not sufficiently an act of his free will due to the close temporal relationship between the display of the recovered furniture to defendant and his confession. (See *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) Finally, defendant argues that the testimony of his girlfriend concerning the circumstances under which she acquired the furniture should be suppressed because the name and

address of his girlfriend was discovered through the unlawful custodial interrogation. See *People v. Armstrong* (1968), 41 Ill. 2d 390, 243 N.E.2d 825, *cert. denied sub nom. Sumlin v. Illinois* (1969), 394 U.S. 992, 22 L. Ed. 2d 768, 89 S. Ct. 1483.

The State contends that the information concerning defendant's girlfriend was elicited during preliminary questioning in Bughouse Square by Officers McHugh and Smith. The State argues that this was not custodial interrogation and that, therefore, *Miranda* warnings were not required to be given to defendant. (*Miranda v. Arizona*; *People v. Parks* (1971), 48 Ill. 2d 232, 269 N.E.2d 484, *cert. denied* (1972), 404 U.S. 1020, 30 L. Ed. 2d 669, 92 S. Ct. 692.) In response to defendant's contention that his confession was not sufficiently an act of free will, the State argues that the trial judge specifically noted that there had been no evidence which indicated that defendant was subjected to either physical or mental coercion. The State urges that the record clearly establishes that defendant received *Miranda* warnings at numerous times during the evening prior to interrogation and that defendant repeatedly waived his rights. The State contends that, in fact, defendant wanted to discuss the circumstances surrounding the homicide. This, the State urges, is sufficient to purge any taint which defendant claims to exist. See *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

■■ ■ *Miranda* requires law enforcement officers to advise a suspect of his constitutional rights where the suspect is in custody and is being interrogated. Custodial interrogation involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.) A situation which is noncustodial does not become a situation which is custodial simply because a court of review determines that the interrogation occurred in a coercive environment. (*People v. Clark* (1980), 84 Ill. App. 3d 637, 405 N.E.2d 1192.) In the instant case, the trial court heard testimony from defendant and various police officers involved in the questioning and arrest of defendant. Except for defendant's testimony, there was no evidence which indicated that defendant revealed the name and address of his girlfriend after he was placed in the police car. The officers testified that the name and address was elicited during preliminary, on-the-scene questioning of defendant in Bughouse Square. The determination of whether defendant was, in effect, in custody is based upon an objective evaluation of the circumstances surrounding the interrogation (see *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870; *People v. Clark*), and, under the facts of this case, we do not believe that the trial court erred in finding that defendant was not in custody at the time he provided the officers with the name and address of

his girlfriend. Accordingly, we hold that there was no unlawful custodial interrogation of defendant which would require suppression of the evidence seized from his girlfriend's apartment and suppression of her testimony. In determining whether defendant's confession was voluntary, the totality of the circumstances surrounding his confession must be evaluated. (*People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195; *People v. Starling* (1978), 64 Ill. App. 3d 671, 381 N.E.2d 817.) In making its determination as to whether the confession of defendant was voluntary, the trial court does not have to be convinced beyond a reasonable doubt that the confession was voluntary. (See *People v. Vinson* (1978), 61 Ill. App. 3d 684, 378 N.E.2d 348.) In addition, the finding of the trial court that a statement made by defendant was voluntary will not be disturbed on appeal unless the reviewing court finds that the finding is against the manifest weight of the evidence. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) Our review of the arguments raised by defendant leads us to conclude that the finding of the trial court that defendant's confession was voluntary is not against the manifest weight of the evidence. Accordingly, the trial court was correct in its refusal to suppress defendant's confession.

■■ Defendant next argues that the classification of burglary as a forcible felony is unreasonable and arbitrary and, therefore, constitutionally infirm under the due process and equal protection clause of the Federal and State constitutions. Neither of the parties have called to our attention any reference to the record in their respective briefs where this issue was presented to and ruled upon by the trial court. We have examined the record and have failed to ascertain if this issue was presented to the trial court and was ruled upon by the court. It appears that this issue has been raised for the first time on appeal and will not be considered. See *People v. Holloway* (1981), 86 Ill. 2d 78, 426 N.E.2d 871; *People v. Householder* (1980), 81 Ill. App. 3d 31, 400 N.E.2d 988.

The judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

GOLDBERG and McGLOON, JJ., concur.