THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ELBERT WILLIAMS, Defendant-Appellant.

First District (1st Division)   No. 1—87—1801

Opinion filed December 26, 1989.—Rehearing denied December 17, 1990.

752

Randolph N. Stone, Public Defender, of Chicago (Bruce Landrum, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, David Butzen, and Judith C. Rice, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

The defendant, Elbert Williams, was tried by a jury and convicted of two counts of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)), of Napoleon (Nate) Williams and Larry Crittendon. He was sentenced to natural life in the Illinois Department of Corrections. The issues presented for review on this appeal are:

(1) Whether *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, which held that the voluntary manslaughter instructions erroneously stated the burden of proof applicable to the issues of provocation and belief of justification, should be retroactively applied to the case at bar.

(2) Whether the trial court erred in denying defendant's motion to suppress his statements.

(3) Whether defendant was proven guilty of murder beyond a reasonable doubt in light of the evidence he presented on the affirmative defense of self-defense.

(4) Whether the trial court erred in giving the jury an instruction which involves the limitation of a self-defense claim where a defendant was purportedly the aggressor.

(5) Whether remarks made by the prosecutor during closing arguments deprived defendant of a fair trial.

(6) Whether the imposition of a natural life sentence without considering factors in mitigation violates the eighth and fourteenth amendments of the United States Constitution.

(7) Whether defendant's sentence was proper under the mandatory life statute.

Prior to trial, a hearing was held on defendant's motion to suppress statements. At the hearing defendant testified that, at the start of the police interrogation, he requested a lawyer but was refused because the detective told him it was too late to get one. He also testified that in response to his requests, he was denied aspirin even though he was suffering pain from a recent gunshot wound. He made similar requests at subsequent interrogations but was similarly refused. Defendant stated that he had difficulty walking and used a cane. During one of these interviews, Detective O'Connor told him that a man named Tubb had a contract out on his life.

Detective Michael O'Connor testified that he had been a police officer since 1966. On the night of January 21, 1986, defendant was arrested outside of the apartment of his girlfriend, Darlene McCoy. Defendant was given his *Miranda* warnings in the squad car. Thereafter, O'Connor and his partner, Patrick Carroll, interviewed defendant.

O'Connor stated that he told defendant his girlfriend had given them a statement incriminating him in a double homicide. He showed defendant an unloaded gun, but did not point the gun at him. He neither threatened nor coerced defendant in order to obtain a statement. O'Connor maintained that defendant never requested a lawyer. He further testified that defendant walked with the use of a cane but denied that he had ever asked for medical attention during the interviews.

Detective Patrick Carroll's testimony was substantially the same as O'Connor's. He stated that defendant was offered food and water but refused them during the interviews. Carroll's testimony corroborated O'Connor's in that defendant never asked for an attorney, and no one ever told him it was too late to obtain a public defender. On cross-examination, Carroll stated that he had been a detective for 20 years. He noticed defendant's disability and that he had a difficult time walking.

The trial court denied defendant's motion to suppress the statements. The trial judge stated that it was a question of credibility of the witnesses and there was no question that the officers were more believable. Before trial, defendant waived his right to a jury for the death penalty phase of his sentencing hearing.

During the trial several witnesses testified on behalf of the State to the following events. Police officer Michael Feldman testified that on January 21, 1986, in response to a call at approximately 4:12 a.m., he discovered the bodies of two black males who had been shot at 54th and Dearborn Streets in Chicago. He found one body with no signs of life and blood coming from the head lying next to a car. He found a wallet on this body but no weapon. He saw another person still alive, lying 100 feet to the north, who was rushed to the hospital.

An evidence technician testified that he photographed the area. He recovered a spent bullet lying in the parking area next to the curb. He identified a photograph showing metal fragments in the area where Crittendon was found lying facedown on the street. The metal fragments of a disintegrated bullet were found underneath his left ear. Crittendon had been wearing a grey jacket and a brown sweater.

Dr. Mitra Kalelkar, a deputy medical examiner, testified that she performed autopsies on the body of each victim. Crittendon was shot twice with a through-and-through bullet wound to the left temple and a bullet wound to the chest that went through the heart, exited the body and caused his death. Nate suffered a bullet wound to the abdomen, that lodged in his left hip bone and caused his death. On cross-examination Dr. Kalelkar stated that an autopsy can reveal whether a

gunshot wound is from close or far range. There was no evidence of close-range firing to Crittendon because there was no evidence of powder or stippling around the wound. However, on redirect she conceded that stippling is generally not found when a gun is shot any farther away than 24 inches.

Laura Wenton, a barmaid at Pretty's Lounge, testified that when defendant and his girlfriend, Darlene, entered the bar between 1 and 2 a.m., Nate was already there shooting pool. Crittendon came into the bar at approximately 3 a.m. When Crittendon came in, he walked over to the defendant, who was seated at the bar, and they talked with each other until closing time. At 4 a.m. defendant, Darlene and the victims all left together and got into defendant's red Cadillac, which was parked out front. She also stated that defendant was limping and using a cane.

Margaret McMillan, a student, who resided on the sixth floor in the building at 5326 South State Street, testified that on January 21, 1986, at approximately 3:45 a.m., she jumped from her bed and went to her bedroom window after hearing two gunshots. She heard two more shots. She then heard another shot and saw a flame emitting from a gun that was being held by a man wearing a brown jacket. He was firing down towards the ground. Next, a long, maroon car pulled up, and the man jumped into the car, which drove south on Dearborn Street.

Lenia Clayton, who resided in apartment 209 in the same building, testified that at about 3:30 a.m. she heard someone arguing outside her bedroom window, but she couldn't hear what was being said at this time. She stated that she looked out of her bedroom window, which faces Dearborn and Federal Streets, and saw three men sitting on a maroon car. A man wearing a brown jacket, which she identified in court, followed a second man, who had been sitting on the driver's side of the car, across the street. The man in the brown jacket fired two shots at the second man, who during this time was talking and throwing up his hands. The second man bent over, grabbed his chest and then fell to the ground.

Mrs. Clayton further testified that the man in the brown jacket then walked back across Dearborn Street. As she called the police on the telephone by the window, she heard a third man, who was wearing a blue jacket and standing by the car, say, "Bones, what are you going to shoot me for[?] Don't shoot me." She heard two more shots and saw the third man fall on his face. Mrs. Clayton testified that the "shooter" then walked back across the street and fired his gun in the same place where the first man had fallen. A car pulled up, and the

man jumped in the passenger's side and the car left. Mrs. Clayton gave a statement to two plainclothes officers outside of her apartment after the incident.

On cross-examination, she admitted that she had not told the officers the three men were sitting in the car and that she did not get a good look at anyone's face. She stated, however, that the man in the brown jacket was trotting and did not use a cane.

It was then stipulated that, if called, Officer R. Smith would testify that he received and tested a .357 Smith and Wesson revolver that had been recovered during the investigation. He compared a bullet taken from Nate's body with a bullet fired from the .357. He could not definitely conclude the bullet came from the gun because of its mutilated condition, but he determined that it had the same characteristics, lands and grooves.

Detective John Robertson testified that he conducted a search of an apartment at 5307 South Justine, pursuant to a consent to search signed by Darlene McCoy. He recovered a .357 Smith and Wesson gun from a gym bag found in the bedroom closet and a coat.

Detective Carroll testified to essentially the same matters he testified to during the motion to suppress, as noted earlier. He further stated that defendant made a statement in the presence of the assistant State's Attorney, indicating that he shot two men in self-defense and told them of the shooting, which occurred on January 6, 1986, where he had been shot by the victims.

The parties then stipulated that one of the victims, Crittendon, had been convicted of voluntary manslaughter in 1981 and of a felony for unlawful use of weapons in 1984. The parties also stipulated that, if called to testify, Detective L. Swistowicz would state that he interviewed Lenia Clayton on the day of the incident in her apartment and made a report of the interview. During the interview, Mrs. Clayton told him she thought three or four people were *in* the car, and did not say they were *on* the car. He did not recall Mrs. Clayton mentioning that defendant shot Crittendon a second time while standing over him or saying anything about trotting or about seeing anyone's hands.

Following these stipulations, defendant testified on his own behalf. He stated that on January 6, 1986, he was shot in the abdomen by Nate, who was accompanied by Crittendon, as he walked towards his car. He suffered injury to the spine which partially paralyzed him, made it difficult to walk or run and required the use of a cane. He and the victims had been friends for many years, and he had no idea why they wanted to shoot him. Defendant did not make out a police report against the victims. When he got out of the hospital, he pur-

chased a .357 magnum.

Defendant then testified that on the night of January 21, 1986, the following events occurred. Defendant was still limping and using a cane. At about 2 a.m., he and his girlfriend, Darlene, visited Pretty's Lounge. He was carrying his gun in his pocket. While sitting at the bar, he noticed Nate Williams shooting pool. Later, Crittendon came into the lounge and asked defendant for $10, which he refused. When he went to the bathroom, Nate and Crittendon followed him in and threatened him. Defendant then walked out of the bathroom, and he and Darlene immediately left the lounge. When they got to the car, Crittendon and Nate jumped him from the rear, threatened him with a "gun-like" object and forced themselves into his car. Crittendon then forced Darlene to drive to 53rd and Dearborn Streets.

At 53rd and Dearborn, the three men got out of the car. Crittendon attempted to force defendant into a building at that location, but defendant refused to go. During an argument, Crittendon reached into his pocket and came up with something in his hand. Defendant then drew his gun and fired four or five shots. Afterwards he got in his car and left. He stated that he did not shoot Crittendon while he was lying on the ground. He did not tell the police about the January 6 incident because he was afraid. On cross-examination, defendant stated that Crittendon was 12 to 15 feet away and Nate was 10 to 12 feet away when he shot them.

In rebuttal, it was stipulated that Detective Robertson would testify that the gun was fully loaded when recovered from the apartment. Officer Green then testified that on January 6, 1986, he responded to a call of a man being shot and found defendant. Defendant described his assailant to him but indicated that he did not know him. Defendant had told Green that, after leaving Pretty's bar, he had proceeded to his car when a black male approached him, stuck a gun in his back and demanded money. He refused, and as he turned towards his assailant, he was shot in the abdomen. Green admitted that defendant's alleged statement that he did not know his assailant was not included in his written report of the incident.

During closing argument the prosecutor argued that Crittendon pleaded for his life before being shot. Over defendant's overruled objections, he further commented that the victims were not on trial and that they were "not trying the person who shot defendant on January 6." During rebuttal argument, again over defendant's overruled objections, the prosecutor commented "there is only one way the bullet fragments got underneath his head." Following closing arguments the jury found defendant guilty of the murders of Nate and Crittendon.

## I

Defendant first maintains that *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, which held that the voluntary manslaughter instructions erroneously stated the burden of proof applicable to the issues of provocation and belief of justification, should be retroactively applied to the case at bar. At the outset, we note that we need not discuss this issue within the context of whether or not *People v. Reddick* should be retroactively applied to the instant case under the plain error exception to the waiver rule because our review of the record resolves that any instructional error which occurred was harmless error in view of the overwhelming evidence of defendant's guilt.

In the consolidated cases of *People v. Reddick* and *People v. Lowe*, our supreme court recently held that the Illinois Pattern Jury Instructions (IPI), Criminal, No. 7.04 (voluntary manslaughter-provocation) and Criminal, No. 7.06 (voluntary manslaughter-belief of justification) (2d ed. 1981) (hereinafter IPI Criminal 2d) erroneously state the burden of proof on the issues of whether a defendant acted under sudden intense passion and unreasonable belief in justification. The court there found that when either of these instructions was to be read in conjunction with the instruction for murder, it failed to properly inform the jury that the burden to disprove the particular mitigating mental state rests upon the prosecution.

*People v. Reddick* also addressed the failure of both defendants therein to object to the instructions, to present alternative instructions or to raise the issues in a post-trial motion. Nevertheless, the court there held that the improper instructions constituted plain error and in each case awarded a new trial to defendants.

In the case at bar, defendant received one of the voluntary manslaughter instructions and the same murder instruction found to be erroneous in *People v. Reddick*. However, under the facts here presented, we conclude that any error was harmless beyond a reasonable doubt. We believe that the record, when viewed as a whole, reflects that the State sustained its burden of disproving that defendant was acting with an unreasonable belief that the killing was justified. Further, a trial court's error in giving a jury instruction does not justify reversing a conviction where the evidence in support of the conviction is so clear and convincing that the jury could not reasonably have acquitted him (*People v. Moore* (1983), 95 Ill. 2d 404, 447 N.E.2d 1327; *People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343; see also *Rose v. Clark* (1986), 478 U.S. 570, 92 L. Ed. 2d 460, 106 S. Ct. 3101); and hence, the jury's verdict would not have been different. *People v. Ward* (1965), 32 Ill. 2d 253, 256, 204 N.E.2d 741; *People v. Bailey*

(1986), 141 Ill. App. 3d 1090, 1104, 490 N.E.2d 1334.

In the present case, the State presented two witnesses whose testimony showed that defendant followed one victim across the street; and although the victim motioned with his hands, presumably attempting to ward off any harm to himself, defendant shot him twice at close range. Then, the defendant returned to where the second victim stood; and despite his pleas, shot him at close range. Defendant next returned to where the first victim lay and pointed his gun towards the man's head and fired yet another shot in that same direction. Medical testimony revealed that both victims had been shot at close range.

Defendant testified that the victims had shot him on an earlier occasion, Crittendon had a propensity for violence, and that on the night of the shootings, he was threatened by the victims, forced into his car with a gun-like object and forced to drive to another location. At the location, he once again was threatened. Crittendon reached for something in his pocket which caused defendant to draw and fire his gun.

However, the witnesses' accounts of what happened totally contradicted the defendant's story. Moreover, defendant carried a gun on his person. He had it with him when he entered the lounge and the car. When he was first allegedly threatened by the victims in the bathroom, he took no action to prevent further trouble. No objects or weapons were found on the victims or near the scene. There was no evidence presented of any bruises on defendant or of an indication of a fight between the parties. In addition, the defendant neither reported the shooting of January 6, 1986, nor filed a complaint against the decedents, excepting the initial police report taken at the scene of the incident, which did not implicate either of the victims.

Hence, our review of the record in the instant cause demonstrates that there was no evidence presented during the trial to support defendant's contentions that he could have unreasonably believed that circumstances existed which would justify killing Nate Williams and Larry Crittendon. Furthermore, the evidence of defendant's guilt was so clear and convincing that "an erroneous instruction on the crime of voluntary manslaughter based on belief of justification could not have prejudiced the defendant" (*People v. Austin* (1989), 133 Ill. 2d 118, 124, citing *People v. Chevalier* (1989), 131 Ill. 2d 66, 71, 76); and therefore, is not a ground to reverse his convictions for murder. See *People v. Carter* (1988), 177 Ill. App. 3d 593, 532 N.E.2d 531.

## II

Defendant next contends that the trial court erred in denying his motion to suppress his statements.

█▌ It is well settled that the trial court will look to the "totality of the circumstances" in determining whether a defendant's confession was voluntary (*People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195; *People v. Starling* (1978), 64 Ill. App. 3d 671, 381 N.E.2d 817; see *People v. Dixon* (1981), 102 Ill. App. 3d 426, 430 N.E.2d 547 (wherein the trial court found that the police officers' testimony was more credible than that of the defendant)). The trial court need not be convinced beyond a reasonable doubt, and we will not disturb its findings unless they are contrary to the manifest weight of the evidence. *People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, cited in *People v. Martin* (1984), 102 Ill. 2d 412, 426-27, 466 N.E.2d 228.

Defendant maintains that the trial judge erred in denying his motion to suppress his statements because the trial judge improperly considered matters outside the record. In support of this contention, defendant points to the judge's remarks that the two officers who testified are "probably two of the older detectives we have in the homicide division. I have to believe the officers." Defendant argues that a police officer's testimony is to be evaluated in the same manner as that of any other witness, and there is no presumption that such testimony is more credible than that of any other witness. *People v. Ford* (1983), 113 Ill. App. 3d 659, 447 N.E.2d 564.

█▌ Defendant also asserts that it is well established that the deliberations of the trial judge are limited to the record before him. (*People v. Wallenberg* (1962), 24 Ill. 2d 350, 181 N.E.2d 143.) While this is a correct assessment of the law, any reference thereto is misplaced, because in the case at bar, the record supports the conclusion that the trial judge based his decision on matters within the record. The record clearly reflects testimony that Detective O'Connor had been on the police force since 1966 and that both officers were veteran detectives.

Moreover, we find nothing in the record to support defendant's contention that the trial court gave more credence to the officers' testimony simply because they were policemen. It is well settled that it is the function of the trier of fact to weigh the testimony and to judge the credibility of the witnesses. *People v. Jones* (1980), 86 Ill. App. 3d 1013, 408 N.E.2d 764.

■ The use of the statement at trial was nonprejudicial to defendant in that his admission alone did not form the basis for the convictions. There was considerable other evidence presented by the State which would lead to a finding of guilt beyond a reasonable doubt. (See *People v. Tolbert* (1980), 81 Ill. App. 3d 977, 401 N.E.2d 1004.) The trial judge was in the best position to observe the witnesses and review the evidence. After reviewing the record, we believe that the trial judge's decision was not contrary to the manifest weight of the evidence. Accordingly, we will not disturb the trial judge's denial of defendant's motion to suppress.

### III

Defendant next claims that he was not proven guilty of murder beyond a reasonable doubt in light of the evidence he presented on the affirmative defense of self-defense. Defendant first contends that his convictions for murder should be reversed because the State failed to prove beyond a reasonable doubt that he did not act in self-defense. Defendant maintains that once the issue of an affirmative defense such as self-defense has been raised, the State has the burden to prove beyond a reasonable doubt that the defendant was not acting in self-defense. (*People v. Bailey* (1975), 27 Ill. App. 3d 128, 326 N.E.2d 550.) Defendant argues that the weight of the evidence clearly shows that he reasonably believed he was in imminent danger of death and that he was justified in using deadly force to protect himself because he had previously been shot by the victims, one of whom had a reputation for violence; and on the night of the shooting, he was accosted and threatened in the bar by the men, who then followed him out of the bar and forced him to drive to a housing project. He cites to *People v. Honey* (1966), 69 Ill. App. 2d 429, 217 N.E.2d 371, *People v. Bailey* (1975), 27 Ill. App. 3d 128, 326 N.E.2d 550, and *People v. Shipp* (1977), 52 Ill. App. 3d 470, 367 N.E.2d 966, in support of his argument. He next asserts that the testimony of the State's witnesses was unbelievable and insufficient to erase all reasonable doubt of self-defense. Finally, defendant contends that at best, the evidence at trial supports a conviction for voluntary manslaughter. Ill. Rev. Stat. 1983, ch. 38, par. 9—2(b); *People v. Brown* (1974), 19 Ill. App. 3d 757, 312 N.E.2d 789.

■ The State counters that the evidence presented supports the murder convictions and that it shows defendant knowingly and intentionally killed these two individuals. We agree.

Initially, we determine that the cases relied upon by defendant

can be distinguished from the case at bar. In *People v. Honey*, the decedent came looking for the defendant, the defendant picked up a weapon after being cornered, and the defendant attempted to revive the decedent. In the case before us, defendant went to a bar in which he had seen the decedents on prior occasions. He brought a fully loaded weapon with him. He made no attempts to revive the victims after the shooting. In *People v. Bailey* and *People v. Shipp*, the court held that the defendants killed in self-defense. However, in *People v. Bailey* all of the evidence showed the defendant did everything he could to prevent the deaths. In *People v. Bailey* the defendant told the victims he did not want to fight, and even handed his gun to a friend at the scene as a show of "good faith" during an argument with the victims. In *People v. Shipp*, the defendant killed her ex-husband after he continued to harass her after their divorce. Their past relationship was stormy and violent, as witnessed by many persons. In addition the victim there had served time for attempted murder after he tried to kill the defendant on a prior occasion.

In the instant case, there is only the testimony of defendant that he attempted to avoid the shooting. As previously discussed, he made no charge against the victims to substantiate his assertion that they had shot him on an earlier occasion. There was no evidence in the record of any prior trouble between the victims and the defendant other than defendant's claim. Further, there was conflicting testimony as to whether defendant even knew who shot him on January 6, 1986. The officer who reported to the scene testified during rebuttal that he recalled defendant had told him he did not see his assailant.

Moreover, there was no evidence in the record to support defendant's contention that he was aware of Crittendon's prior arrest record at the time of the shooting. As stated previously, no weapon was found on either victim, although defendant testified that he was threatened by a gun-like object and Crittendon took something out of his pocket. Defendant argues that this factor does not diminish his case of self-defense because it is the defendant's perception of the danger, and not the actual peril, which is dispositive of the issue. (*Bailey*, 27 Ill. App. 3d at 134-36.) We do not agree with this argument. In *People v. Bailey*, the court there found that once it has been determined that a defendant initially fired in self-defense, the trial courts are reluctant to conclude that the span of only a few seconds is a sufficient time for defendant to realize that further shooting is unnecessary. (*Bailey*, 27 Ill. App. 3d

at 135.) However, in the instant case, there was never an initial finding of self-defense.

Hence, we find that the evidence in the record supports the jury's finding that defendant neither killed the victims in self-defense, because he did not reasonably believe that the force he used was necessary to prevent imminent death or great bodily harm to himself, nor did he possess an unreasonable belief that the shooting was justified, which would warrant reducing the crimes to voluntary manslaughter. *People v. Garcia* (1978), 65 Ill. App. 3d 13, 382 N.E.2d 316.

■ Further, we believe that defendant's argument that the testimony of the witnesses was unbelievable and did not prove that he did not act in self-defense is meritless. Apparently, the trier of the facts believed that the testimony of both eyewitnesses, Margaret McMillan and Lenia Clayton, was credible and substantially corroborated each other's version, while the defendant's account was uncorroborated. Moreover, it is the function of the jury to observe the demeanor of the witnesses and judge their credibility (*People v. Almo* (1985), 108 Ill. 2d 54, 483 N.E.2d 203; *People v. Perry* (1980), 91 Ill. App. 3d 988, 415 N.E.2d 523), and we will not substitute our judgment for that of the jury unless the evidence is so improbable as to raise a reasonable doubt of guilt. See *People v. Molstad* (1984), 101 Ill. 2d 128, 133, 461 N.E.2d 398.

IV

The fourth error at trial asserted by the defendant is that the trial court erred in giving the jury an Illinois Pattern Jury Instruction which involves the limitation of a self-defense claim where a defendant was purportedly the aggressor. Initially, the State contends that defendant waived any objection to this instruction because he failed to object to the instruction when it was proffered at the instructions conference or tender an alternative instruction. (*People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141; *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 415 N.E.2d 1027.) Defendant responds that the waiver rule should not apply because the failure to correctly instruct the jury on the elements of the crime charged is grave error. (*People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861.) Defendant argues that there is nothing in the record to justify giving this instruction. The instruction states:

"A person is not justified in the use of force if he initially provokes the use of force against himself with the intent to use that force as an excuse to inflict bodily harm upon the

other person." IPI Criminal 2d No. 24—25.11.

██ ▌ We need not address defendant's arguments since we conclude that his failure to specifically object to the aforementioned instruction at the instruction conference constitutes a waiver of that issue on appeal. (*People v. Caballero* (1984), 102 Ill. 2d 23, 41, 464 N.E.2d 223.) Even if the court were to consider the issue not waived, we believe that defendant's argument that there is no evidence to justify giving the instruction is without merit. Even very slight evidence upon a given theory will justify an instruction. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 52.) The prosecution's theory was that defendant was the aggressor. The evidence adduced at trial showed that defendant went to a bar where he had seen the victims on previous occasions while armed with a loaded revolver. All of the parties left the lounge together. They rode together in defendant's car to another location, where an argument ensued. Crittendon walked away from the car and crossed the street. Defendant followed him across the street, they argued again and defendant shot him. (See *People v. Weisberg* (1947), 396 Ill. 412, 71 N.E.2d 671.) The defendant then came back across the street where Nate had remained and shot him. We believe that the evidence, when viewed in its entirety, presented a question as to whether or not defendant was the initial aggressor. Where there exists a question as to whether the defendant was the initial aggressor, the giving of such an instruction is proper. (*People v. Ellis* (1982), 107 Ill. App. 3d 603, 437 N.E.2d 409.) Moreover, even where a reviewing court finds that an improper instruction was given, it will not reverse the trial court unless the instruction affected the outcome of the verdict. *People v. Rufus* (1982), 104 Ill. App. 3d 467, 432 N.E.2d 1089.

## V

We next consider whether prosecutorial remarks made during closing arguments deprived defendant of a fair trial. Defendant next contends that prosecutorial misconduct during closing arguments deprived him of his constitutional right to a fair trial. Specifically, he contends the prosecutor: (1) improperly gave his own testimony, misstated the evidence and argued facts not proved by the evidence (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246), by arguing Crittendon pleaded for his life, that defendant lowered the gun to Crittendon's head and shot him in a manner rarely seen in the projects, and that the evidence of the metal fragments showed defendant fired in "cold-blood," rather than in self-

defense; (2) accused defense counsel of attempting to free his clients through trickery or deception (*People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41; *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68), by implying that defense counsel was trying to "dirty up the victim" and "turn the tables"; and (3) misstated the law (*People v. Ray* (1984), 126 Ill. App. 3d 656, 467 N.E.2d 1078), when he told the jury during rebuttal that "[t]he only issue is whether or not it is murder or voluntary manslaughter."

■■ It is well settled that a prosecutor is permitted great latitude in his closing arguments (*People v. Hine* (1980), 88 Ill. App. 3d 671, 679, 410 N.E.2d 1017), and the trial court's determination of the propriety of an argument will not be disturbed upon review absent an abuse of discretion, extreme error (*People v. Reese* (1984), 121 Ill. App. 3d 977, 460 N.E.2d 446), or a showing of substantial prejudice to the defendant. (*People v. Pittman* (1982), 93 Ill. 2d 169, 176, 442 N.E.2d 836; *People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200.) The standard for determining whether the prosecution's remarks constitute reversible error is whether these remarks were such that without their having been made the jury might have reached a different conclusion. *People v. Barnes* (1983), 117 Ill. App. 3d 965, 978, 453 N.E.2d 1371.

■■ Considering the foregoing in light of the record, we find that the prosecutor's remarks made in closing arguments were proper in that they either restated the evidence presented at trial, were supported by the record, or were legitimate inferences drawn from the facts and circumstances proven at trial. (See *People v. Bunting* (1982), 104 Ill. App. 3d 291, 432 N.E.2d 950.) We do not agree that the prosecutor's remarks sought to define the law and conclude that his comments regarding "murder or voluntary manslaughter" were permissible deductions from the evidence, where the jury was made well aware of its duty to acquit defendant if he was not proven guilty beyond a reasonable doubt. *People v. Bloodworth* (1979), 68 Ill. App. 3d 341, 385 N.E.2d 904.

■■ Further, the statement "dirtying up the victim" "was not beyond reproach, but it did not rise to the level of error" (see generally *People v. Rufus* (1982), 104 Ill. App. 3d 467, 477, 432 N.E.2d 1089), and at best was harmless error. The statement neither prejudiced the defendant nor deprived him of a fair trial. (*People v. Reese* (1984), 121 Ill. App. 3d 977, 460 N.E.2d 446; *People v. Nemke* (1970), 46 Ill. 2d 49, 263 N.E.2d 97.) Moreover, the trial court specifically admonished the jury that comments not based on the evidence should be disregarded and that neither opening statements

nor closing arguments were evidence. See *People v. Deacon* (1985), 130 Ill. App. 3d 280, 473 N.E.2d 1354.

## VI

Defendant next maintains that the trial court's imposition of a natural life sentence without considering factors in mitigation violates the eighth and fourteenth amendments of the United States Constitution. Defendant was sentenced under section 5—8—1(a)(1)(c), the mandatory natural life sentence provision of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(1)(c)). On appeal, he contends this provision is unconstitutional because it imposes natural life imprisonment without consideration of mitigating factors in violation of the eighth and fourteenth amendments of the United States Constitution. Defendant asserts that the imposition of life imprisonment with no possibility of parole is like a death sentence; and thus, unless factors in mitigation are considered, there is a due process deprivation. As here conceded by the defendant, several appellate court cases have rejected this argument and found that the mandatory natural life sentence provision does not violate defendants' due process rights under similar circumstances.

■■ It is well settled that the legislature has wide discretion to prescribe penalties for defined offenses (*People v. Bradley* (1980), 79 Ill., 2d 410,- 403 N.E.2d 1029), and unless the challenged penalty is clearly in excess of constitutional limitations, it will be upheld as valid. (*People v. Boswell* (1985), 132 Ill. App. 3d 52, 476 N.E.2d 1154. See also *People v. Cannon* (1986), 150 Ill. App. 3d 1009, 502 N.E.2d 345; *People v. Denson* (1985), 139 Ill. App. 3d 914, 487 N.E.2d 777.) These cases conclude that the legislature obviously considered the seriousness of multiple murders and determined that it was within the public interest to impose the sentence it imposed.

In addition, in *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, the supreme court noted that the legislature has determined that no set of mitigating circumstances could allow a proper penalty of less than natural life for the crimes of two or more murders. Based upon this precedent, we conclude that the trial court's imposition of a natural life sentence without considering factors in mitigation was not a violation of defendant's constitutional rights.

## VII

Defendant finally contends that his sentence was improper un-

der the mandatory life statute. Defendant maintains that since two sentencing provisions are applicable to his conduct, one of which permits a discretionary natural life sentence (section 5—8—1(a)(1)(b)), and one of which is a mandatory natural life provision (section 5—8—1(a)(1)(c)), he should have been sentenced under the less rigid provision. He asserts that where an ambiguity exists in penal statutes, such ambiguity must be resolved in favor of the defendant. *People v. McCarty* (1983), 94 Ill. 2d 28, 445 N.E.2d 298; *People v. Carlock* (1981), 102 Ill. App. 3d 1100, 430 N.E.2d 212.

■■■ A specific provision of a statute prevails over a general provision under rules of statutory construction. (*People v. Caryl* (1977), 54 Ill. App. 3d 537, 369 N.E.2d 926.) Subsection 5—8—1(a)(1)(b) is a general provision governing, as a guide to the trial judges, those circumstances when they may sentence a defendant to life imprisonment. Subsection 5—8—1(a)(1)(c) is a specific provision making a natural life sentence mandatory under circumstances including but not limited to those wherein a defendant has been convicted of two or more murders.

■■■ Moreover, contrary to defendant's assertions, the word "shall" should be construed as being mandatory rather than permissive. (See *Taylor*, 102 Ill. 2d 201.) Further, in determining whether a criminal statute meets due process requirements, a court looks to the language of the statute and its purpose (*People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31; *People v. Lewis* (1979), 73 Ill. App. 3d 361, 386 N.E.2d 910), and where more than one construction may be placed upon a statute, the court should select the one that leads to a logical result. (*People v. Sansone* (1981), 94 Ill. App. 3d 271, 418 N.E.2d 862.) Accordingly, we find that the sentencing by the circuit court judge followed the applicable statutory provision; and thus, defendant's argument is an insufficient ground to disturb his convictions.

For the reasons stated above, the judgment of the circuit court is affirmed.

Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.