THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMMIE JOHNSON, Defendant-Appellant.

First District (5th Division)   No. 1—89—3361

Opinion filed March 27, 1992.

Michael J. Pelletier and Karen Daniel, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Latz, and Lisa Ciardelli, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

Following a bench trial, defendant Sammie Johnson was convicted of first degree murder. The trial court sentenced defendant to 28 years' imprisonment. On appeal, defendant contends that he was not proved guilty of first degree murder beyond a reasonable doubt and that the charge should be reduced to second degree murder; that the Illinois murder statute is unconstitutional; that the trial court erred in not appointing new counsel for defendant when he presented his *pro se* post-conviction motion alleging ineffective assistance of counsel; and that the sentence was improper.

George Nance, a sergeant with the Ford Heights, Illinois, police department testified for the State that on April 23, 1989, at about 4 p.m., he responded to a radio call regarding a shooting at 17th and Ellis Avenues in Ford Heights. Nance arrived at the scene and found the body of Leo Armstrong, who had been shot in the back of the head. Nance had seen Armstrong several days earlier, in connection with a police investigation, in the hospital emergency room being treated for an arm injury.

At the scene, Nance spoke with Terry Brooks. Nance then sought out defendant, whom he located the next day around noon. Defendant was arrested, and he gave a statement. Defendant stated that he was walking down the street when:

"Leo and Moon [Terry Brooks], drove up and Leo said, 'Why you tell Freddie to ask me where Tim was at?' I said, 'Why you call me for Freddie?' That I'm not in that stuff. He said, 'I'll beat your little punk tail.' He jumped out of the car, started walking up on me. I kept walking back. Moon was driving back slowly with the car. So, I said, 'Go on, Leo.' He said, 'I'll beat your little ass.' With his arm in his jacket. I kept backing back. He kept following me so I pulled out the gun. He said, 'Shoot. Shoot.' So, I shot and he kept coming. So, I shot two more times. Then he fell. I dropped the gun. And ran. When I was running I saw Dunsa, supposed to be his cousin, following me in Moon's car so I just kept running and that's it."

Sergeant Nance asked defendant about any prior encounters between defendant and Armstrong. Defendant replied:

"We used to be friends. That was it. We just say hello, go on, leave. Never hung together. He had told me prior that he was going to beat me up in front of Freddie and Rodney Johnson. When he approached me, he had his hands in his jacket. I thought he was going to shoot me. When [sic] I shot him."

Nance testified further that no weapon was recovered at the scene.

Terry Brooks testified for the State that on April 23, 1989, he was driving with the victim on 17th Avenue. No one else was in the car. As they approached Ellis Avenue, they saw defendant walking and "Leo told me to stop." The victim, who remained in the car, asked defendant "why he was telling lies on him." Defendant told the victim to "get the f--- out of his face." The victim then began to get out of the car, saying: "You think I'm handicapped because my arm is hurt? I'll wipe your ass with one arm." Brooks testified that the victim was referring to the fact that his collar bone was fractured or bruised and his right arm was strapped down to his stomach. The victim had on a sweat jacket with no shirt, with his left arm in the sleeve and the jacket draped over his right arm. Brooks did not see the victim with a weapon.

Brooks testified that he then heard defendant tell the victim to "go on." Defendant "walked away and then he turned around," about seven feet from the car. Defendant "pulled a long black gun out of his back, out of the back of his belt." Defendant aimed the gun, and fired a shot. The victim started running away from defendant. Brooks heard defendant's gun "click three times." Then he heard two more gunshots, and he saw the victim fall. Defendant turned and ran. Brooks walked over to the victim, lying facedown on the ground, and saw "a hole in the back of his head."

On cross-examination, defense counsel questioned Brooks about any drug dealings he had with Leo Armstrong:

"Q. As a matter of fact, you work for Leo, don't you?

A. No.

Q. Don't you sell drugs for Leo?

[PROSECUTOR]: Objection.

THE WITNESS: No, I don't sell no drugs.

THE COURT: Sustained.

\* \* \*

[DEFENSE COUNSEL]: How long had you been working for Leo?

[PROSECUTOR]: Objection, Judge.

THE WITNESS: I ain't working for nobody.

THE COURT: Asked and answered."

Paul W. Groah, an assistant State's Attorney, testified for the State that on April 24, 1989, he took this statement from defendant:

"On 4/23/89, I saw Leo Armstrong in a car with Moon [Brooks]. He got out of the car and kept coming on me. We were face to face the whole time. He kept walking up on me. I kept walking backwards. He had his right arm in his jacket. I reached into my back pants and pulled out a gun. I had purchased the gun earlier in the afternoon, because I wanted it for protection and I was scared. I pulled the trigger once, heard a shot, and Leo kept coming on me. I pulled the trigger at least two more times. I don't know how many times, exactly. Leo was still coming toward me. I saw Leo fall. I dropped the gun and ran. When Leo got out of the car, I never saw him with a gun, a knife, a club, or any weapon."

Defendant made three corrections to the written statement and signed the document.

The parties stipulated that if Dr. Shaku-Teas, a pathologist, were to testify, she would state that an autopsy of the victim revealed that the 26-year-old male weighed 216 pounds and measured 70½ inches tall. One gunshot wound entered behind the left ear and traversed at a diagonal until it lodged in the right forehead. The direction of the wound track was back to front, left to right.

Terry Brooks testified for the defense, also. He stated that there may have been other eyewitnesses. "Could have. I haven't seen them." A man named "Dunsa" was not with them, and Brooks denied telling Sergeant Nance that Dunsa was present.

Rhonda Clerk testified for defendant that on April 21, 1989, at about 10 p.m., she saw Armstrong and two men on the side of her house. Defendant then arrived. As defendant was walking to the front door,

Armstrong asked where Tim was. Defendant replied: "I don't know. You should know." Armstrong then called defendant a "short bastard" and threatened to kill him. Armstrong was walking towards defendant. He had nothing in his hands. Defendant then went into Clerk's house, stayed five minutes, and left by the back door. Clerk soon exited her house through the front door. Armstrong called her a "black bitch" and threatened to "smack" her. At that point, for the first time that evening, Clerk saw Armstrong holding a black gun in his hand. Clerk and her sister went to the police station to report the incident. When they returned to the house with the police, Armstrong was gone.

Alfred Lee Washington, who was subpoenaed, testified for defendant that on April 23, 1989, he saw Armstrong and Moon (Terry Brooks) in a car at 17th and Ellis Avenues. Armstrong exited from the car and walked over to defendant, arguing with him. Washington could not hear what the two men were saying; however, he could see that Armstrong "was steady walking [*sic*]" towards defendant. Defendant was "backing back." Washington testified further: "And then I seen an object appeared to be a gun because Sammie fired one shot." The first shot was fired into the air. At this point, Washington was kneeling down behind a bush, about 45 feet away. Washington heard a second shot fired. He looked up and saw defendant "running on that third shot." Defendant was "running away from the scene." After the third shot was fired, Armstrong fell to the ground. Between the second and third shots, Armstrong had not moved. Armstrong remained facing defendant at all times. Armstrong never tried to run away. Washington never saw a weapon in Armstrong's hands, and never saw Armstrong raise his hand to strike defendant.

Sergeant Nance was also called to testify on behalf of defendant. Nance stated that Brooks had told him Armstrong, Brooks and "Dune" were present at the scene. Nance never spoke with "Dune," although he knew him. Nance testified further that he spoke with Clerk several days before the shooting regarding an alleged assault on Clerk by Armstrong. Clerk told Nance that Armstrong had threatened her with a gun. Nance also testified that he was aware of Armstrong's reputation in the community and that there had been a number of complaints made against him for threats of violence.

Defendant, who was 19 years old, testified that on April 23, 1989, he saw Armstrong with Moon (Terry Brooks) and Dune. Armstrong asked defendant "why did I go around lying on him." Defendant replied: "Don't bring that to me. I'm not in that stuff." Armstrong said: "You think I'm playing with you. I'll kick your little ass." Defendant kept walking. Moon, who was driving, followed defendant slowly. Armstrong got out of the car and "began to walk towards me." Moon and Dune exited the car, also.

Armstrong said, "I'll kill your little ass." Defendant was "scared and then at that time I pulled out a gun."

Defendant testified further: "I told them to 'Leave me alone. I'm not in that stuff.' " Armstrong replied, "Shoot, shoot." Defendant fired over his head into the air, and then saw that Armstrong's hand was in his coat. He did not remember if Armstrong's arm was in the jacket sleeve. He could see something that looked like a belt around Armstrong's waist. Armstrong "kept coming towards" defendant. Defendant tried to fire again into the air, but the gun did not discharge. "Then I looked at him. I [sic] looked as if he was trying to come out of his jacket with something." Defendant "took it he had a gun, trying to come out with a gun." Armstrong stood three or four feet from defendant. Defendant began to walk backwards. Defendant then "began to turn and run." At that point, "I was just shooting backwards." He was "running [and] I pointed the gun backwards and [was] shooting it," but he was not looking backwards. After firing the gun several times, defendant looked back and saw Armstrong on the ground. Defendant dropped the gun and ran.

Defendant also testified that on April 21, 1989, he saw Armstrong with a gun during an "incident" between defendant and Armstrong. He did not report the incident to the police.

On cross-examination, defendant testified that he had bought the gun an hour before the shooting took place. He never checked to see whether or not it was loaded. Defendant testified on redirect that he was 5 feet 2 inches tall and weighed 135 pounds. Defendant was previously convicted of possession of a controlled substance with intent to deliver on January 12, 1989, and was placed on probation.

The court found defendant guilty of first degree murder. The court noted that Brooks' "observation[s] as to the relative positions of the defendant, [and] victim is corroborated by the photograph evidence. *** That bullet entered on the left rear of the victim's head above his ear." The court pointed to photographs that evidenced the bullet lodged above the right eye. "That photographic [evidence] rebuts the defense's theory that the victim kept coming, kept coming." The court continued: "With respect to the issue of the defendant's apprehension of this victim there may have been some of that. But not to the degree required by the statute for reduction of this charge to *** second degree murder."

OPINION

Defendant first contends that the conviction for first degree murder should be reduced to second degree murder because he believed that the victim was going to inflict great bodily harm upon him.

Upon review, when faced with a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.) Whether a homicide is classified as first or second degree murder is a question for the trier of fact. (*People v. Falconer* (1988), 168 Ill. App. 3d 618, 522 N.E.2d 903.) The burden of proof is on defendant to provide the mitigating factor by a preponderance of the evidence. (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(c).) A person commits second degree murder if he kills an individual and at "the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing" as self-defense, but "his belief is unreasonable." (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a)(2).) Defendant must believe that force was necessary to prevent imminent death or great bodily harm, even though that belief was unreasonable. *People v. Peterson* (1990), 202 Ill. App. 3d 33, 559 N.E.2d 762.

Defendant maintains that his belief that the use of deadly force was necessary is evidenced by the fact that on April 21, 1989, Armstrong threatened to kill defendant; that Armstrong approached defendant on the street on April 23, 1989, and again threatened to kill him; and that Armstrong's right hand was hidden by his jacket.

■ The trial court, sitting as the trier of fact, could reasonably believe Brooks' testimony that the victim began running away from defendant after the first shot was fired. The medical evidence strongly corroborated this testimony, as it showed that the bullet entered the back of the victim's head, on the left side, and traveled to the front of the victim's head, on the right side. Defendant's version, that he ran from the victim, shooting blindly over his shoulder, was uncorroborated and was in fact inconsistent with his prior statements to the police.

The trial judge was not required to believe defendant's testimony that he saw the victim with a gun two days prior to the shooting. The defense witness Clerk testified that the victim had nothing in his hand when he exchanged comments with defendant that day. It was not until after defendant left that Clerk saw Armstrong with a weapon.

Moreover, the defendant never reported the April 21 incident to the police. See *People v. Williams* (1989), 205 Ill. App. 3d 751, 563 N.E.2d 762 (defendant never reported prior incident where victim allegedly shot defendant, two weeks before defendant killed the victim).

Nor did the defendant specifically mention the April 21 incident in his statement to the police and the assistant State's Attorney, when questioned about the instant occurrence. In reply to Nance's question about prior encounters with the victim, defendant merely said that they "used

to be friends" and that the victim had previously told defendant "that he was going to beat me up."

The trier of fact could also rely on the fact that no weapons were found on Armstrong. (See *People v. Williams*, 205 Ill. App. 3d 751, 563 N.E.2d 762.) Defendant admits he never saw Armstrong with a weapon. There was no evidence of a physical fight, or more than the exchange of a few words. Although the victim was bigger than defendant, his verbal threats and physical size presented little threat to defendant once defendant pulled out his gun and immediately began firing.

The trial judge could also have relied on the fact that in his statements to the police and the assistant State's Attorney, defendant said that he shot the victim when they were face to face. "I shot and he kept coming. So, I shot two more times. Then he fell." Defendant also said: "We were face to face the whole time." At trial, however, defendant altered the story and said that he ran from the victim, shooting blindly over his shoulder.

Concomitantly, the trial court was not required to believe the defense witness Washington, who testified that the victim never turned and ran from defendant. Washington was 45 feet away, hiding behind a bush, and admitted not seeing the second shot.

It is the function of the trier of fact to observe the demeanor of the witnesses and judge their credibility. (See *People v. Williams*, 205 Ill. App. 3d 751, 563 N.E.2d 762.) There is sufficient evidence in the record to support the trial court's conclusion that defendant did not believe Armstrong was threatening him with imminent death or great bodily harm. Thus, we find that in viewing the evidence in the light most favorable to the State, the trial court could have found the essential elements of first degree murder beyond a reasonable doubt.

■■ Defendant next contends that the Illinois murder statute (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1, 9—2) unconstitutionally violates the due process, equal protection and separation of powers clauses. We have recently rejected these arguments numerous times, and we follow those holdings here. See, *e.g., People v. Davis* (1991), 221 Ill. App. 3d 1023, 583 N.E.2d 64 (and citations contained therein); *People v. Smalley* (1991), 249 Ill. App. 3d 964; *People v. Newbern* (1991), 219 Ill. App. 3d 333, 579 N.E.2d 583; *People v. Wright* (1991), 218 Ill. App. 3d 764, 573 N.E.2d 1090; *People v. Thomas* (1991), 216 Ill. App. 3d 469, 576 N.E.2d 1020; *People v. Doss* (1991), 214 Ill. App. 3d 1051, 574 N.E.2d 806; *People v. Gore* (1991), 212 Ill. App. 3d 984, 571 N.E.2d 1041.

Defendant next contends that the trial court erred in not appointing new counsel for him when he filed his *pro se* post-trial motion alleging ineffective assistance of trial counsel, and attaching a complaint which

defendant had filed against his trial attorney with the Illinois Attorney Registration and Disciplinary Commission (ARDC). On appeal, defendant does not challenge the effectiveness of his trial counsel, and thus we do not address that issue. Nevertheless, defendant complains that because of the pending ARDC complaint, a *per se* conflict of interest existed, and thus defendant was deprived of his right to conflict-free counsel.

On November 14, 1989, defendant's private counsel filed a motion for a new trial. On November 14, 1989, a hearing was held on that post-trial motion. Defendant appeared, tendering to the court a handwritten statement alleging ineffective assistance of counsel without specifying any particular claim. The handwritten statement requested that the "court appoint me a bar association lawyer or a murder taskforce lawyer to handle the further proceedings in my case in accordance with the 6th and 14th Amendment rights to the United States Constitution, *Gideon v. Wainwright*, cite as 83 Supreme Court 792." Defendant also filed with the court an ARDC complaint form, filled out by defendant and dated November 9, 1989, listing the following grievances: failed "to file the proper pretrial motion"; failed "to investigated [*sic*] the facts of my case"; failed "to interview material witnesses"; failed "to subpoena material evidence of hospital records or any criminal history of victims or eyewitness[es] for the purpose of impeachment or the creditability [*sic*] of such witnesses"; failed "to challenge weaknesses in prosecution [*sic*] case"; failed "to present adequate defense"; requested "$2,300 to hire a private investigator"; "did not handle properly my case"; "did in fact show neglectfulness and unethical practices with my case before the tribunal in which he violate[d] the canon code of ethics" (then quoting Canons 1 and 6, Rule 1—102, and Rule 7—101(a)); and failed to have a "pre-trial consultation." (Defendant contradicts this final allegation later in the complaint, stating that: "I was misled *before trial* in that he convince[d] me to wave [*sic*] my rights to a jury trial." (Emphasis added).)[1]

The trial court addressed defendant at the post-trial hearing: "Earlier today *** you tendered to me a handwritten statement and a copy of a complaint form directed to the [ARDC] *** in support of

---

[1] The ARDC complaint concludes with this statement: "I am earnestly aggrieved by the wantoness of this attorney who neglected my case and I am earnestly asking this *** Commission for your undivided fidelity and to review this complaint with impartiality and to take the appropriate measures to assure that the Canon Code of Ethics [is] enforced in this issue. And to preclude this wanton misconduct from ever being mimistered [*sic*] again in the procedures before a judicial tribunal to protect the public from injury by dishonest, neglgectful [*sic*] and unethical lawyers who fail to perform their duties professionally, competently and diligently."

your handwritten statement asserting the issue of ineffective assistance of counsel." The court commented on the pretrial and trial proceedings at length, including the fact that prior to trial the court had carefully admonished defendant regarding the nature of the charges, the possible penalties and the meaning of a jury waiver. The court stated that it had reviewed the ARDC complaint, and "all of my notes, which are rather copious," of the trial. The court concluded that it did "not find any basis for the charge of ineffective assistance of counsel."

Without questioning either defendant or defense counsel about the specifics of the ARDC complaint, the trial judge went on to address defense counsel. "Now, I have to move on to the next issue and that it [sic] the motion for [a] new trial that your attorney *** filed in this cause." At that point, defense counsel made an amendment to the post-trial motion for a new trial. (The post-trial motion filed by counsel did not include an ineffective assistance of counsel argument.) Defense counsel then argued the post-trial motion orally at length. After hearing arguments from both attorneys, the court denied the motion for a new trial. The court then heard arguments relating to sentencing, in aggravation and mitigation, and imposed sentence on defendant.

In its brief filed with this court, the State relies on *People v. Pecoraro* (1991), 144 Ill. 2d 1, 578 N.E.2d 942, where the court held that the trial judge was not required to appoint other counsel to replace defendant's private attorney at the post-trial hearing which addressed defendant's *pro se* claim of ineffective assistance of counsel (failure to make certain trial objections; impeach State witnesses, and call certain other witnesses for the defense). After finding that defendant had not established ineffective assistance of counsel under *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the court in *Pecoraro* went on to state:

"In further support of our position, nowhere in the record does it reflect that defendant requested other counsel to represent him. ***

*** [D]efendant Pecoraro retained private counsel to represent him at trial and in post-trial motions. It was not within the trial court's rubric of authority to advise or exercise any influence or control over the selection of counsel by defendant, who was able to, and did, choose counsel on his own accord. [Citation.] Moreover, the trial judge could not force defendant to retain counsel other than that chosen by defendant. [Citation.]

Defendant and his counsel were the only parties who could have altered their attorney-client relationship. Defendant could have retained other counsel to represent him prior to the hearing of his post-trial motions." *Pecoraro*, 144 Ill. 2d at 14-15.

But see *People v. Pecoraro*, 144 Ill. 2d at 21-23 (Clark, J., dissenting) (Justice Clark stated that in regard to an ineffective assistance claim, there is no difference between retained and appointed counsel. "It is as equally inappropriate for private counsel to argue his incompetence at a post-trial hearing as it is for an appointed public defender"). (Emphasis in original.)

We note that, unlike the facts in the present case, the defendant in *Pecoraro* did not file a disciplinary complaint against his lawyer. We further note that the defendant in *Pecoraro* did not request a continuance to obtain new counsel, and that defendant "did not request that he be represented by other counsel." (*Pecoraro*, 144 Ill. 2d at 15.) Consequently, we do not believe *Pecoraro* stands for the proposition that a trial court is free to automatically deny a *pro se* request for new counsel simply because the defense counsel who was allegedly ineffective was privately retained.

■ In the evaluation of a claim of ineffective assistance of counsel, there is no distinction between court-appointed counsel and privately retained counsel. (*McCoy v. Court of Appeals* (1988), 486 U.S. 429, 438, 100 L. Ed. 2d 440, 453, 108 S. Ct. 1895, 1902 ("Every advocate has essentially the same professional responsibility whether he or she accepted a retainer from a paying client or an appointment from a court"); *Cuyler v. Sullivan* (1980), 446 U.S. 335, 344-45, 64 L. Ed. 2d 333, 344, 100 S. Ct. 1708, 1716 ("A proper respect for the Sixth Amendment disarms petitioner's contention that defendants who retain their own lawyers are entitled to less protection than defendants for whom the State appoints counsel. *** [W]e see no basis for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers"); *United States ex rel. Cosey v. Wolff* (7th Cir. 1982), 682 F.2d 691; *People v. Williams* (1989), 182 Ill. App. 3d 598, 538 N.E.2d 564, *aff'd* (1990), 139 Ill. 2d 1, 563 N.E.2d 431.) Thus, we reject the State's argument that under *Pecoraro*, simply because defendant retained private counsel he could not have new counsel appointed for him, even where defendant specifically requests such an appointment if a true conflict of interest were otherwise demonstrated.

Accordingly, defendant's contention that the court should have appointed new counsel cannot be disregarded simply because his attorney was privately retained.

The sixth amendment right to effective assistance of counsel includes a right to conflict-free counsel. (*Strickland v. Washington* (1984), 466 U.S. 668, 688, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065 (defense counsel "owes the client a duty of loyalty, a duty to avoid conflicts of interest"); *Wood v. Georgia* (1981), 450 U.S. 261, 271, 67 L. Ed. 2d 220, 230, 101 S. Ct. 1097, 1103 (sixth amendment gives rise to a "correlative right to representation that is free from conflicts of interests").) Whether a conflict of interest exists must be evaluated on the specific facts of each case. *Smith v. Lockhart* (8th Cir. 1991), 923 F.2d 1314, 1320.

If an actual conflict is shown, defendant need not show prejudice since "some conflicts of interest so affront the right to effective assistance of counsel as to constitute a *per se* violation of the sixth amendment." *United States v. Aiello* (2d Cir. 1990), 900 F.2d 528, 531, citing *Cuyler*, 446 U.S. at 349-50, 64 L. Ed. 2d at 347, 100 S. Ct. at 1718-19. See also *Mathis v. Hood* (2d Cir. 1991), 937 F.2d 790, 795 (same).

The trial court, however, has a "duty to inquire" into the effectiveness of counsel whenever "the *possibility* of a conflict" becomes apparent. (Emphasis in original.) *Wood v. Georgia*, 450 U.S. at 272, 67 L. Ed. 2d at 230-31, 101 S. Ct. at 1103-04; see also *Cuyler v. Sullivan*, 446 U.S. at 347, 64 L. Ed. 2d at 346, 100 S. Ct. at 1717 (inquiry should be initiated whenever court "knows or reasonably should know that a particular conflict exists").

Significantly, " '[i]f the reasons are made known to the court, the court may rule without more.' " *United States v. Welty* (3d Cir. 1982), 674 F.2d 185, 187-88, quoting *Brown v. United States* (D.C. Cir. 1959), 264 F.2d 363, 369 (*en banc*) (Burger, J., concurring in part); *McKee v. Harris* (2d Cir. 1981), 649 F.2d 927, 934.

Here, the court made sufficient inquiry where defendant provided the court with a written document purportedly listing all reasons for his claim of ineffective assistance. The court thoroughly examined the documents tendered by defendant, reviewed its copious pretrial and trial notes and discussed its reasoning at length.

Some courts have found a *per se* conflict of interest exists where defendant has filed a grievance with an attorney disciplinary body. For example, in *People v. Cano* (1991), 220 Ill. App. 3d 725, 581 N.E.2d 236, this court recently held that, under the particular facts of that case, defendant's filing of a disciplinary claim against defense counsel created a conflict of interest requiring appointment of new counsel for the post-trial hearing. The court held that a *per se* conflict existed where defendant had filed an ARDC complaint against his ap-

pointed public defender. We remanded for a new hearing on the post-trial motion with directions that an attorney not associated with the public defender's office be appointed. (*People v. Cano*, 220 Ill. App. 3d 725, 581 N.E.2d 236.) In *Cano*, however, counsel was appointed, and the court required the assistant public defender's supervisor to argue the effective assistance of counsel claim filed against his subordinate, despite the supervisor's repeated request that the court "not place [him] in a position of arguing a motion on behalf of the defendant and against [trial counsel], of whom I am his supervisor." *People v. Cano*, 220 Ill. App. 3d at 731, 581 N.E.2d at 240.

See also *Mathis v. Hood* (2d Cir. 1991), 937 F.2d 790, 796 (defendant's filing of a disciplinary action against his attorney was a "conflict that established a *per se* violation of Mathis's right to effective assistance of counsel"); *Douglas v. United States* (D.C. App. 1985), 488 A.2d 121, 136-37 (holding that as soon as defense counsel learned that defendant had filed a complaint with bar counsel, "he acquired a personal interest in the way he conducted *** [the] defense"; circumstances "were not conducive to the cooperative spirit and singlemindedness of purpose that ordinarily should underlie a defendant/attorney relationship"; however, trial court's findings that the conflict of interest would have adversely affected counsel's ability to render effective assistance were given "substantial deference").

In contrast, other cases in Illinois have found no conflict of interest even where defendant filed an ARDC complaint or a lawsuit against defense counsel. For example, in *People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14, this court held that reversal of conviction was not required as a result of alleged conflict resulting from defendant's mother's having filed an ARDC complaint against defense counsel. The court held that there was no *per se* conflict arising from the pending ARDC complaint. "In the present case the defendant has failed to demonstrate good cause." (*Gardner*, 47 Ill. App. 3d at 535.) The court found the public defender had acted competently. "Even though trial counsel articulated the difficulty he would have in adequately representing the defendant because of the personal conflict, it is within the judge's discretion whether or not to appoint another attorney." *Gardner*, 47 Ill. App. 3d at 535.

In *People v. Arnold* (1991), 218 Ill. App. 3d 647, 655, 577 N.E.2d 1355, this court held that "the fact that defendant has filed suit against the public defender representing him does not fall into [the] category of *per se* conflict."

In *People v. Hardeman* (1990), 203 Ill. App. 3d 482, 560 N.E.2d 1198, the court held that the trial counsel did not abuse its discretion

in denying defense counsel's post-trial motion to withdraw on the basis of a potential conflict of interest stemming from defendant's having filed a civil malpractice lawsuit against him. This court stated that "the trial judge had the discretion to find that for purposes of the present case the civil suit was frivolous and was utilized merely as an attempt to frustrate the administration of justice in his courtroom." 203 Ill. App. 3d at 491.

In *People v. Heard* (1989), 181 Ill. App. 3d 943, 947, 537 N.E.2d 883, the court did not regard defendant's filing of ARDC complaint against trial counsel "as evidence or lack of evidence that the attorney's conduct may have been incompetent."

Other jurisdictions have held similarly. See, *e.g., Carter v. Armontrout* (8th Cir. 1991), 929 F.2d 1294, 1300 ("a defendant who files a lawsuit against his attorney does not necessarily create such a conflict" of interest; court accepts "the state court's credibility determinations" regarding hearing testimony by trial counsel and by defendant, sufficiently establishing that "except [for] the filing of the lawsuit," there was no evidence of an "irreconcilable conflict"), citing *Smith v. Lockhart* (8th Cir. 1991), 923 F.2d 1314, 1321 n.11; *Miles v. Vasquez* (N.D. Cal. 1991), ___ F. Supp. ___, 1991 U.S. Dist. LEXIS 10627 (dismissing petition for writ of *habeas corpus*; court relied on State trial court's findings that defendant made motion to discharge attorney for purpose of delaying proceedings; petitioner's filing of a civil rights action against his attorney "does not automatically create a conflict which requires removal of defense attorney. Without the malpractice action, there is nothing in the record to indicate that a conflict existed between petitioner and defense counsel"); *State v. D'Ambrosio* (1988), 156 Ariz. 71, 73, 74, 750 P.2d 14, 16, 17 (remanded for post-conviction evidentiary hearing; filing of a disciplinary complaint is not a *"per se* violation of a criminal defendant's right to receive effective assistance," but the "complaint before the State Bar was specific and in depth, describing numerous instances of ineffectiveness"); *McLeod v. State* (Ala. App. 1991), 588 So. 2d 537, 538 (affirming trial court's denial of post-conviction relief and trial court finding that the "fact that Petitioner filed a complaint with the bar association about his appointed counsel is no evidence of ineffective assistance of counsel"); *Mendes v. United States* (D.C. App. 1991), 595 A.2d 972, 974 (defendant's filing of complaint against professional responsibility board alleging ineffective assistance on behalf of his private, retained attorney was found by trial court to be a "blatant attempt to subvert the judicial process"); *State v. Michael* (1989), 161 Ariz. 382, 384, 778 P.2d 1278, 1280 (defendant's filing of a bar com-

plaint against his privately retained attorney does automatically create conflict of interest requiring withdrawal of counsel; there was "no abuse of discretion in the trial court's refusal to find an actual conflict of interest preventing Howard from representing defendant").

Thus, we do not believe that every time a defendant files a disciplinary complaint, the court must honor his request for new counsel.

The American Bar Association has also commented on this problem:

> "Clients' interests sometimes also clash with their lawyers' interests in their professional reputations as lawyers. This occurs most often when clients either sue or threaten to sue their lawyers for malpractice, file or threaten to file disciplinary charges against them ***. ***
>
> * * *
>
> Courts are less likely, in criminal cases at least, to disqualify lawyers solely because their clients have filed disciplinary complaints against them. The reason for this restraint is the courts' concern over making it too easy for criminal defendants to get rid of their court-appointed lawyers, delay their trials, or obtain reversals of their convictions." ABA/BNA Lawyers' Manual on Professional Conduct, at 51:406 through 51:407 (February 28, 1990), citing *State v. Michael* (Ariz. App. 1989), 778 P.2d 1278.

*State v. Sinclair* (1986), 46 Wash. App. 433, 730 P.2d 742.

Courts have similarly expressed a concern that appointment of new counsel after defendant files a disciplinary complaint might "cause many [defendants] to file disciplinary charges against their attorneys." (*Mathis v. Hood*, 937 F.2d at 796.) "Were [the filing of a formal complaint] sufficient to disqualify court-appointed counsel, however, a defendant could force the appointment of a new attorney simply by filing such a complaint, regardless of its merit." (*State v. Sinclair* (1986), 46 Wash. App. 433, 437, 730 P.2d 742, 744.) Thus, courts do not permit a defendant to "employ complaints against counsel as a dilatory tactic." *United States v. McFadden* (3d Cir. 1980), 630 F.2d 963, 972. See also *State v. Michael* (1989), 161 Ariz. 382, 778 P.2d 1278 (where the court held: "As a matter of public policy, a defendant's filing of a bar complaint against his attorney should not mandate removal of that attorney. A ruling to the contrary would encourage the filing of groundless bar complaints by defendants whose only motivation is to delay their own day of reckoning"). *Michael*, 161 Ariz. at 384-85, 778 P.2d at 1280-81, citing *People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.

Similarly, in *Smith v. Lockhart* (923 F.2d at 1321 n.11), the court "recognize[d] the danger of any holding implying that defendants can manufacture conflicts of interest by initiating lawsuits against their attorneys." The court held that a "patently frivolous lawsuit brought by a defendant against his or her counsel may not, alone, constitute cause for appointment of new counsel. Trial judges must be wary of defendants who employ complaints about counsel as dilatory tactics or for some other invidious motive." (*Smith v. Lockhart*, 923 F.2d at 1321 n.11.) In *Smith v. Lockhart*, however, the court found that Smith raised his objections to trial counsel "at the earliest possible time and consistency and vigorously objected to him," and that his lawsuit against the attorney "was not patently frivolous." *Smith v. Lockhart*, 923 F.2d at 1321 n.11.

In contrast to *Smith v. Lockhart*, here the defendant did not raise his objections until the day of the post-trial hearing. There is no indication that he communicated with the court prior to the hearing, or that he fired his attorney prior to or during that hearing. In addition, the ARDC complaint appears "patently frivolous." It merely parrots general assertions which might be applicable to any case, such as defense counsel's failure to "present adequate defense" to failure to "handle properly my case."

Generally, it is a duty of the trial court to determine whether, for example, the "disciplinary complaint *** [is] well founded," or whether it is merely a "frivolous complaint against an attorney, or one filed for purposes of delay, or even one filed for the purpose of obtaining new counsel, [which] would not create a conflict of interest." (*Mathis v. Hood*, 937 F.2d at 796.) "It is the trial judge who is assigned the ultimate responsibility for thwarting transparent and manipulative tactics of the defendant while at the same time ensuring that there is good cause for the defendant's complaints about counsel and that the defendant's waiver of counsel is voluntary." (*United States v. Welty* (3d Cir. 1982), 674 F.2d 185, 194.) Thus, it is the responsibility of the defendant to "provide the court with legitimate reasons" supporting his request for new counsel. *State v. Sinclair* (1986), 46 Wash. App. 433, 436, 730 P.2d 742, 744.

Here, the defendant offered nothing more than vague reasons to support his request for new counsel. (See *State v. Sinclair*, 46 Wash. App. at 436, 730 P.2d at 744 (defendant offered only "a vague account of how counsel had lied" but otherwise "failed to articulate any reason" to the trial or appellate courts for replacing counsel).) We do not believe the trial court violated defendant's sixth amendment right to conflict-free counsel by refusing defendant's last-minute request to ap-

point counsel other than his private counsel (who may not even have been fired yet by defendant) to assist him at the post-trial hearing.

Defendant finally contends that his sentence was improper because the trial court improperly found, without any basis in the evidence, that the crime was drug-related.

A sentence determination lies within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Here, defendant was convicted of first degree murder, for which he can be sentenced to a term of 20 to 60 years in prison. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1).) Defendant was sentenced to 28 years in prison.

The State argues that the "trial court did not say that the murder was drug-related." During the sentencing hearing, the trial court stated:

> "Now, I know that these events all unfolded in the suburb of Ford Heights *** in which there are problems *** associated with drugs and I know from your presentence report about your prior conviction of possession of a controlled substance in which you were placed on probation for two years, only a few short months before this offense, the murder charge occurred.

> *** I think that your intent to commit the murder is inherent in the sequence of events that I have just alluded to, in that incident where your girlfriend was testifying about, there was [*sic*] prior drug dealings involving the victim and you and his friends.

> This is another facet of our nationwide problem, drug deals going sour, fighting about the proceeds or fighting about the drugs themselves or enforcing collection. These are spawning an epidemic of crime nationwide and to a degree, that problem exists in the community of Ford Heights.

> * * *

> Now, this sentence is imposed in part as a deterrent to you and also to the citizenry of our community. You just can't receive a slap on the wrist and send the message to the community.

> I want the young people out there and the old people, if they get involved in the type of conduct that precipitated this ultimate offense of murder, they need to know that the courts will deal with it sternly and, hopefully, it will deter them from that type of conduct."

██ This language indicates to us that the trial court did in fact consider the crime to be drug-related. However, there was no evidence in the record from which such an inference could be drawn.

No one testified that defendant or the victim was involved in drug dealings or that the argument between them was drug related. Thus, we remand the cause for resentencing. See *People v. Smith* (1989), 178 Ill. App. 3d 976, 985, 533 N.E.2d 1169 (remanded for resentencing where sentencing judge believed the offense was gang-related, notwithstanding absence in record of any evidence that defendant shot the victim because of gang-related motives). See also *People v. Hammock* (1979), 68 Ill. App. 3d 34, 385 N.E.2d 796 (sentence reduced where sentencing judge believed, without support in the record, that defendant had inflicted mental abuse on the victim and that defendant was a persistent law violator although he had no prior record).

Accordingly, the judgment of the circuit court of Cook County is affirmed, and the cause is remanded for a new sentencing hearing.

Judgment affirmed; remanded with directions.

McNULTY, P.J., and LORENZ, J., concur.