2020 IL App (1st) 180171-U

No. 1-18-0171

November 12, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 16254 |
| | ) | |
| LARRY JOHNSON, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We remand for a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), where the trial court did not sufficiently inquire into defendant's posttrial ineffective assistance of counsel claim.

¶ 2    Following a bench trial, defendant Larry Johnson was found guilty of three counts of attempt first degree murder and one count of aggravated battery against each of three victims. For each victim, the trial court merged the counts into a single count of attempt first degree murder and sentenced defendant to three consecutive terms of 31 years thereon, for a total of 93 years'

imprisonment. Defendant appeals, arguing that the trial court did not conduct a sufficient preliminary inquiry into his posttrial ineffective assistance of counsel claim as required by *People v. Krankel*, 102 Ill. 2d 181 (1984), and that he was entitled to the procedure despite being represented by private counsel. We agree, and remand to the trial court for a preliminary *Krankel* inquiry.

¶ 3    Based on a shooting on August 13, 2014, defendant was charged in a 12-count indictment with 3 counts of attempt first degree murder (720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West 2014)) and 1 count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2014)) against each of three victims: Tempestt Woods (counts I-III and X), Devante Wandick (counts IV-VI and XI) and D'Mario Gatlin (counts VII-IX and XII).

¶ 4    At trial, Woods testified that on August 13, 2014, she was at a house near 86th Street and Ingleside Avenue in Chicago visiting friends. She had one drink of liquor, then left through an alley go to another friend's house. When she reached the backyard, she saw Wandick sitting on the porch, but did not notice anyone else in the area. Before Woods reached the porch, a man ran in front of her and "pointed a weapon" at her while standing two to five feet away. The man's face was uncovered and he wore light blue jeans, white shoes, and a plaid shirt with a white t-shirt underneath. Woods saw the man's face, and identified defendant as the man in court.

¶ 5    Defendant shot Woods in her right forearm and stomach. She collapsed and did not see what defendant did next, but heard 7 to 10 more shots from "close to the house." Woods was shot twice more, then felt a "whiff" as defendant "jumped over" her and "fled the scene." Woods was hospitalized for three weeks and underwent multiple surgeries that left scarring on her arms, pelvis,

and back. While in the hospital, Woods spoke to detectives and identified defendant in a photo array. Woods had never seen defendant prior to the shooting, though she had heard his name.

¶ 6    On cross-examination, Woods testified that she smoked marijuana and drank four ounces of liquor prior to the shooting. She could not see anyone else on the porch when she approached from the alley, but heard three voices. The porch was dark, but there were streetlights in the area. Woods noticed another person while she walked through the alley and saw that person's clothing and face, but she did not know the person was "coming towards" her. She did not hear anyone say defendant's name immediately after the shooting. Prior to the shooting, she had known Wandick for around two years and saw him regularly. Between the shooting and trial, Woods did not speak with Wandick or Gatlin about the case or spend time with them.

¶ 7    On redirect, Woods testified that defendant was seven to nine feet from her in the alley. No one told her defendant's name between the incident and her photo array identification.

¶ 8    Gatlin testified that he had a conviction for residential burglary from 2013. On August 13, 2014, he went to his friend Daniel Watkins's house. Gatlin had smoked marijuana and drank alcohol that night. At some point, Gatlin, Wandick, and another man were on Watkins's porch. Ten to fifteen minutes later, he saw Woods approach from the alley.

¶ 9    As Woods neared the porch, a "man with a hoodie on" shot Woods from behind. Gatlin never saw the man stand in front of Woods. Gatlin heard two to three gunshots, then saw Woods fall. The shooter approached the porch, which had lights on, and there were also streetlights in the area. The shooter stopped on the porch steps and shot Gatlin in the back. Gatlin saw the shooter's face, and identified defendant in court as the shooter. Defendant shot him two more times, once in the leg and once in the stomach, then shot towards Wandick. Gatlin heard 10 to 20 gunshots in

total during the incident. He saw Wandick jump off the porch during the shooting, and walk up the porch with emergency personnel after the shooting ended.

¶ 10    Gatlin stayed in the hospital for a month following the shooting. At the time of trial, he had three bullets in his body, including one in his chest, one in his buttocks, and a fragment in his rib. He underwent three surgeries and had scars from the injuries. Prior to the shooting, Gatlin shared three "blunts" of marijuana but did not have a drink. Gatlin identified defendant in a photo array on August 14, 2014. He did not know defendant and had not heard his name prior to the shooting. Gatlin did not speak to Wandick or Woods between the shooting and the photo array identification.

¶ 11    On cross-examination, Gatlin stated that he did not see anyone with Woods when she first approached the backyard. The only time Gatlin thought Woods could have been facing defendant was if "she turned over on the ground." Defendant wore a black "hoodie." After the shooting, Gatlin heard Wandick identify defendant by name as the shooter. Wandick also smoked marijuana and drank alcohol prior to the shooting. On recross-examination, Gatlin said he spoke with Woods and Wandick between the date of the incident and trial.

¶ 12    Wandick testified that he went to elementary and middle school with defendant and identified him in court. On August 13, 2014, he was with Watkins, Gatlin, and a man he knew as "Blue Eyes" at Watkins's home, where the men played video games, drank alcohol, and smoked marijuana. Wandick did not have anything to drink. At some point Wandick, Gatlin, and "Blue Eyes" were on the back porch while Watkins was "across the street somewhere." The lighting on the porch was dim, but it was bright where there were streetlights.

¶ 13    Wandick first saw Woods about 15 minutes after he arrived at the porch. She did not make it inside the gate to the backyard before defendant shot her. Wandick saw defendant's face and

recognized him. Defendant wore all black clothing and shot Woods four times while standing "[r]ight behind her." Woods fell, and defendant approached the porch. Wandick jumped over the banister. He heard additional shots, then ran to the "front" and told someone to call an ambulance. Wandick later realized he had been shot in the foot. Police arrived, and Wandick told them that defendant was the shooter. Woods and Gatlin were present when Wandick identified defendant.

¶ 14    Wandick received treatment at the hospital for his injuries. While at the hospital, Wandick again told police officers that defendant shot him, and identified defendant in a photograph. Prior to the shooting, Wandick had not seen defendant since eighth grade.

¶ 15    On cross-examination, Wandick testified that defendant wore "all black" on August 13, 2014. Woods never turned to face defendant before he shot her. Wandick went to the front of the house immediately after jumping over the banister, but returned to the backyard when the shooting stopped. By this time, ambulances had arrived. He last saw defendant seven or eight years prior to August 13, 2014.

¶ 16    Zachary Hall testified that he was arrested on August 23, 2014, for an outstanding warrant. The charge was ultimately vacated, but he was in custody at the Cook County jail for three days following the arrest. Defendant was Hall's cellmate for a "few" hours during this period, and Hall identified defendant in court. He had never met defendant before his arrest. Defendant told Hall that he was charged with attempt murder because he "tried to shoot three people." The shooting had to do with "disrespect" towards him regarding one of his deceased "peers." He shot the "girl" first, then one "guy" in the stomach, and another "guy" while that individual "was getting away." He fired the weapon, a .40-caliber firearm, approximately "15 [or] 16" times during the incident.

¶ 17    Hall informed a corrections officer of what defendant said. Prior to that conversation, no prosecutor or detective asked Hall to obtain information from defendant. Hall never received a promise or threat in exchange for testimony against defendant, though he knew he could be held in contempt of court if he did not testify.

¶ 18    On cross-examination, Hall testified that did not recall how long his conversation with defendant lasted. Hall told the corrections officer about what he heard because he was "trying to get out" of jail. One day passed between the conversation and the time Hall informed the corrections officer. His charges were dismissed the same day he was released from jail. On recross-examination, Hall said he spoke with a police officer before his release, but not an attorney.

¶ 19    The State entered stipulations that if called, Abdala Abuzanat, an evidence technician for the Chicago Police Department, would testify that he took a video of the crime scene, which was published to the court, and it was a fair and accurate depiction of the scene. He would further testify that he recovered shell casings and fired bullets from the scene. Kellen Hunter, a forensic scientist for the Illinois State Police, would testify that he tested cartridge cases, a fired bullet, fired bullet jacket fragments, a lead bullet core, and a firearm in connection with the case, and would testify consistently with his report. The report, which was attached to the stipulation and is included in the record on appeal, states in relevant part that the cartridge cases were fired by the same firearm.

¶ 20    The State entered a further stipulation that John Clisham would testify that he extracted data from a certain cellular phone, and the data was contained on a DVD marked People's Exhibit No. 39.

¶ 21    Detective William Sullivan testified that on August 13, 2014, he and his partner Detective Michelle Moore-Grose investigated the shooting. They arrived on scene and spoke to an officer, who told them that one of the victims identified defendant by name as the shooter. Sullivan instructed other detectives to interview the victims at the hospital. Detective Brian Drees and Detective Garcia[1] interviewed Wandick and showed him a photograph of defendant, which Wandick signed. Sullivan also conducted photo arrays with Woods and Gatlin, in which both identified defendant.

¶ 22    Defendant was arrested on August 15 and told officers that his address was 7000 South Parnell, apartment 701. The officers confiscated his cellular phone, and Sullivan obtained a search warrant for the phone and extracted and reviewed information from it. The phone contained photographs of a .40-caliber black firearm and defendant holding that firearm.

¶ 23    In January 2017, Sullivan received a firearm, introduced at trial as People's Exhibit No. 48, that another individual had been arrested with, which resembled the firearm defendant held in the photographs. Forensic ballistic analysis revealed that the casings recovered from the scene matched casings "that came out" of the .40-caliber black firearm Sullivan received in 2017.

¶ 24    On cross-examination, Sullivan testified that during an interview on August 16, 2014, Wandick said that he knew defendant and considered him a friend, but had not talked to defendant "for a few months." Sullivan did not recover a firearm from defendant during the investigation and had no knowledge of the circumstances under which People's Exhibit No. 48 was recovered.

¶ 25    Chicago police officer Paul Kirner testified that on September 21, 2014, he recovered a firearm near the 6900 block of South Parnell Avenue in Chicago following a foot pursuit in which

---

[1] Detective Garcia's first name does not appear in the report of proceedings.

the suspect discarded the firearm. On the scene, Kirner learned the suspect's name was Theodore Jones, who was later arrested on October 9, 2014. Kirner identified People's Exhibit No. 48 as the .40-caliber black firearm he recovered on September 21, 2014. On cross-examination, Kirner stated that Jones had been charged for possessing the firearm, but the case was still pending.

¶ 26    Chicago police officer Williams[2] testified that he arrested Jones on October 9, 2014, in apartment 701 in a "building located on the southwest corner of 7000 Parnell."

¶ 27    The defense moved for a directed verdict, arguing that the State's evidence did not connect defendant to a firearm and the "four civilian witnesses *** lacked credibility." The court denied the motion.

¶ 28    During closing argument, the prosecutor described the evidence as "overwhelming." He characterized Wandick's identification as reliable due to his familiarity with defendant, and emphasized that Gatlin and Woods independently identified defendant in photo arrays. The prosecutor also pointed to the circumstantial evidence regarding the .40-caliber black firearm. The State further argued that the amount of times defendant fired demonstrated his intent to kill.

¶ 29    Defense counsel argued that all three victims testified incredibly, emphasizing that they were each under the influence of drugs or alcohol at the time of the shooting, their accounts conflicted, and Wandick misrepresented his relationship with defendant. Counsel further argued that Hall testified incredibly because he was motivated by his own self-interest. Additionally, counsel argued that because Jones had not been convicted of possessing the .40-caliber black firearm, defendant could not be "charged" in the present matter with possession of the firearm either.

_____

[2] Officer Williams's first name does not appear in the report of proceedings.

¶ 30    On June 2, 2017, the court found defendant guilty of all charges. In so finding, the court stated that the witnesses were "clear," "credible," and "consistent," and that the evidence regarding Jones's discarded firearm and arrest was competent circumstantial evidence against defendant. The court also did not believe the victims' marijuana use rendered their testimony incredible. Finally, the court believed defendant's repeated firing of the weapon evidenced his intent to kill.

¶ 31    Defendant filed a motion for a new trial. At a hearing on July 5, 2017, the court denied defendant's motion over defense counsel's argument that each victim and Hall all offered incredible testimony.

¶ 32    On September 28, 2017, defendant appeared without counsel and stated that he "hereby raise[d] the issue of ineffective assistance of counsel." Defendant alleged that private counsel did not address "certain facts" involving "inconsistent witness and identification statements." Additionally, there were "many other facts" that defendant would go "into detail with upon request." Defendant also thought private counsel could have presented "a stronger defense" had he dedicated the "proper time," "technique," and "effort." Defendant asked that he be "admonished by the court of recognition and understanding of the issues stated."

¶ 33    The court responded that "these are issues *** possibly *** for [a] motion for a new trial," and noted that private counsel challenged the credibility of the State's witnesses at the hearing on defendant's motion for a new trial. The court asked, "Are there things that you think [private counsel] missed?" Defendant replied, "Yes, a lot." The court said it would "make sure [private counsel] talks to you about that before the next court date." It concluded that, "If there are other things that need to be addressed, I will be happy to hear about it."

¶ 34    Private counsel appeared with defendant on October 5, 2017, and requested a continuance because defendant wanted to present two witnesses at the sentencing hearing who could not appear in court that day. The court asked if defendant still had "any concern" about private counsel. Defendant responded "I do. It's not just [private counsel]; it's about the facts of the case *** [that were not] brought up." The court said defendant "will have a right to appeal," and made no further inquiry. Before adjourning, the court said to defendant, "it seems that you want these people here for sentencing, correct?" Defendant affirmed, and the court set a new hearing date.

¶ 35    After a sentencing hearing on November 9, 2017, the court merged the counts involving each victim into one count of attempt first degree murder of Woods (count I), Wandick (count IV), and Gatlin (count VII), and imposed three consecutive terms of 31 years' imprisonment, for a total of 93 years' imprisonment. The court denied defendant's motion to reconsider sentence on November 30, 2017. This court allowed defendant's late notice of appeal on February 2, 2018.

¶ 36    On appeal, defendant argues that the trial court did not sufficiently inquire into his posttrial ineffective assistance of counsel claim. The State responds that defendant was not entitled to a preliminary *Krankel* inquiry because he was represented by private counsel and never explicitly asked for a new attorney, and that even if he were so entitled, the court's inquiries on September 28 and October 5, 2017, sufficed.

¶ 37    "The common law procedure developed from [the supreme court's] decision in *Krankel* is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *People v. Jolly*, 2014 IL 117142, ¶ 29. The procedure "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." *People v. Patrick*, 2011 IL 111666, ¶ 39. "[A] *pro se* defendant is

not required to do any more than bring his or her claim to the trial court's attention." *People v. Moore*, 207 Ill. 2d 68, 79 (2003). Accordingly, a *pro se* defendant may raise the issue verbally or in writing. *People v. Ayres*, 2017 IL 120071, ¶ 11.

¶ 38    When a *pro se* defendant raises a posttrial ineffective assistance claim, the trial court must undertake a two-step process. First, the court should "examine the factual basis" of the claim in a preliminary inquiry. *Moore*, 207 Ill. 2d at 77-79. During this preliminary inquiry, the court may inquire of defense counsel and the defendant, and use its own knowledge of counsel's performance at trial. *Ayres*, 2017 IL 120071, ¶ 12. Second, after the preliminary inquiry, the trial court can either dismiss the claim if it lacks merit or pertains only to trial strategy, or appoint new counsel to represent the defendant at a subsequent hearing on the claim if the defendant shows possible neglect. *Jolly*, 2014 IL 117142, ¶ 29 (citing *Moore*, 207 Ill. 2d at 77-78). "By initially evaluating the defendant's claims in a preliminary *Krankel* inquiry, the circuit court will create the necessary record for any claims raised on appeal." *Id.* ¶ 38.

¶ 39    In *People v. Pecoraro*, 144 Ill. 2d 1 (1991), the trial court denied two written motions for a new trial, one from private defense counsel and one from the defendant himself, both of which raised ineffective assistance of counsel. *Pecoraro*, 144 Ill. 2d at 12. On appeal, the defendant argued that the trial court should have held a preliminary *Krankel* inquiry and then appointed new counsel to consider the ineffective assistance claims raised in the written motions. *Id.* The supreme court ruled that the defendant was not entitled to a preliminary *Krankel* inquiry because the "defendant retained his own private counsel and did not request that he be represented by other counsel." *Pecoraro*, 144 Ill. 2d at 15. In so ruling, the supreme court emphasized that the defendant had the right to choose his counsel. *Id.*

¶ 40 We addressed *Pecoraro* in *People v. Johnson*, 227 Ill. App. 3d 800 (1992). In *Johnson*, the defendant filed a *pro se* posttrial motion alleging ineffective assistance of counsel, despite still retaining private counsel at the time. *Id.* at 807-08. The defendant attached to the motion his complaint to the Attorney Registration and Disciplinary Commission (ARDC) respecting his private counsel. Additionally, at a hearing, the defendant gave the court a handwritten statement alleging ineffective assistance and requesting a new attorney. *Id.* at 808. The trial court denied the claim without questioning the defendant or counsel. *Id.* at 809. On appeal, the defendant argued that the trial court should have appointed new counsel. The State argued that the defendant could not challenge the trial court's inquiry on *Krankel* grounds because he had private counsel and was therefore not entitled to a preliminary inquiry. *Id.*

¶ 41 The *Johnson* court concluded that the defendant was entitled to a preliminary inquiry. In so finding, it distinguished *Pecoraro* by contrasting the defendant's ARDC complaint and specific request for new counsel with the *Pecoraro* defendant's failure to request new counsel, stating, "we do not believe *Pecoraro* stands for the proposition that a trial court is free to automatically deny a *pro se* request for new counsel simply because the defense counsel who was allegedly ineffective was privately retained." *Johnson*, 227 Ill. App. 3d at 810; see also *People v. Taylor*, 237 Ill. 2d 68, 78 (2010) (Burke, J. specially concurring) ("the majority assumes, without deciding, that *Krankel* applies to privately retained counsel since it addresses the merits of defendant's claim on a factual basis").

¶ 42 The Fourth District addressed this issue in *People v. Shaw*, 351 Ill. App. 3d 1087 (2004). There, the court ruled that the defendant was not entitled to a preliminary *Krankel* inquiry where, as in *Pecoraro*, the defendant retained private counsel at trial, did not request new counsel or a

continuance to obtain new counsel after raising his posttrial ineffective assistance claim, and the parties did not agree that the defendant should have new counsel for purposes of litigating his posttrial claim of ineffective assistance of counsel. *Shaw*, 351 Ill. App. 3d at 1092.

¶ 43 However, in *People v. Mourning*, 2016 IL App (4th) 140270, the Fourth District distinguished *Pecoraro* and *Shaw* and ruled that a defendant represented by private counsel may be entitled to a preliminary *Krankel* inquiry. The court explained, "[w]e hold that *Krankel* applies when a defendant represented by private counsel makes a *pro se* posttrial claim of ineffective assistance of counsel and informs the court that he both (1) desires new counsel and (2) cannot afford new private counsel." *Mourning*, 2016 Il App (4th) 140270, ¶ 20.

¶ 44 Here, during posttrial proceedings on September 28, 2017, defendant explicitly raised the issue of ineffective assistance, complained that private counsel did not sufficiently pursue "inconsistent witness and identification statements," and claimed that counsel could have presented a "stronger defense." Defendant also represented that he had more facts he could explain if the court desired. The court responded that these were issues for a "motion for a new trial" and promised to ensure private counsel would speak to defendant before the next court date. On October 5, 2017, the court acknowledged defendant's statements at the prior hearing and asked if he still had "any concern" with private counsel, to which defendant responded, "I do." The court responded that defendant could raise these concerns on appeal.

¶ 45 Based on this record, and in light of *Johnson*, we find that defendant was entitled to a preliminary *Krankel* inquiry. His comments on September 28, 2017, were unequivocal—he alleged ineffective assistance. At that point, the court was obligated to conduct further inquiry to determine the factual bases for defendant's allegation. The supreme court's holding in *Ayres* is

instructive here. *Ayres*, 2017 IL 120071, ¶¶ 14-18. There, the court ruled that the defendant's written assertion of ineffective assistance by itself sufficed to compel a preliminary *Krankel* inquiry, even in the absence of any additional factual support. The court stated that, "when a defendant brings a clear claim asserting ineffective assistance of counsel, either orally or in writing, this is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *Id.* ¶ 18. Using this standard, defendant here did more than enough to trigger the duty.

¶ 46    The State argues that *Pecoraro* and *Shaw* control because defendant did not explicitly request new counsel in his remarks. *Johnson*, however, does not enumerate this as a requirement, and given the trial court's failure to inquire after defendant directly raised ineffective assistance, we do not believe this was fatal to defendant's right to a preliminary *Krankel* inquiry. See *Moore*, 207 Ill. 2d at 79. Though defendant did not explicitly ask for new counsel, he nonetheless triggered the trial court's duty to clarify whether his claims were appropriate for a motion for new trial or appeal, as the trial court assumed, or were appropriate for resolution within the *Krankel* framework. See *Jolly*, 2014 IL 117142, ¶ 38 (*Krankel* procedure is meant to limit issues on appeal and create a sufficient record for a reviewing court).

¶ 47    The State further argues that defendant stated he wanted to retain his counsel for the sentencing hearing, but the record does not support this argument. The State seemingly refers to the court's question during the October 5, 2017 hearing regarding whether defendant wanted "these people" present for sentencing, but read in context, the court's question appears to refer to defendant's proposed character witnesses, not private counsel.

¶ 48    We now turn to whether the trial court's conduct at the hearings on September 28 and October 5, 2017, satisfied the requirements for preliminary inquiries as explained in *Krankel* and *Moore*. We review this issue *de novo*. *Jolly*, 2014 Il 117142, ¶ 28.

¶ 49    On September 28, 2017, the court responded to defendant's statement about private counsel's alleged ineffective assistance by stating that defendant raised issues that were "possibly" appropriate for a motion for a new trial. Then, on October 5, 2017, the court stated only that defendant's concerns could be raised on appeal. The court did not inquire as to the specific factual bases of defendant's claim at either hearing.

¶ 50    Based on the record, we cannot determine if defendant could show possible neglect, or if his claim is frivolous or only concerns trial strategy, because the court made no substantive inquiry. As such, the court did not satisfy the requirements of *Krankel* and its progeny, and the matter must be remanded. See *id.* ¶ 38; see also *People v. Robinson*, 157 Ill. 2d 68, 86 (1993) (the "trial court should have afforded the defendant the opportunity to specify and support his [ineffective assistance] complaints").

¶ 51    The State argues that defendant's statements revealed his claim was conclusory and based on non-cognizable matters of trial strategy, and the court therefore could rely on its knowledge of the case and did not need to further inquire to satisfy *Krankel*. We disagree. Here, the trial court could not appropriately rely on its knowledge of private counsel's conduct at trial because defendant's claim related in part to issues beyond the in-court proceedings, including counsel's diligence. The State also argues that defendant did not provide sufficient detail during his comments on September 28 and October 5, 2017, regarding private counsel's alleged conduct, but, again, it is the affirmative duty of the trial court to question a defendant and illuminate the bases

for his claim when he raises a posttrial ineffective assistance claim. *Moore*, 207 Ill. 2d at 77-78; see also *Ayres*, 2017 IL 120071, ¶¶ 11, 13.

¶ 52 Finally, the State's argument that any error by the court respecting a preliminary *Krankel* inquiry was harmless is inappropriate because we cannot determine whether an error is harmless in this context without first understanding the bases of defendant's claim. See *Moore*, 207 Ill. 2d at 81.

¶ 53 In sum, defendant was entitled to a preliminary *Krankel* inquiry, which the trial court did not provide. We therefore remand the matter for the trial court to conduct a preliminary *Krankel* inquiry.

¶ 54 Remanded.